567 So.2d 649 (1990)
Tebault BURTON
v.
Robert C. BERTHELOT and A.B.C. Insurance Company.
No. 89-CA-1057.
Court of Appeal of Louisiana, Fourth Circuit.
August 31, 1990.
Writ Denied November 26, 1990.
*652 J. Wayne Mumphrey, Jeff Perigoni, Gregory G. D'Angelo, Chalmette, for plaintiff/appellee.
Timothy G. Schafer, Schafer & Schafer, Richard B. Eason, II, Cristina R. Wheat, Adams & Reese, New Orleans, for defendants/appellants.
Alan A. Zaunbrecher, Dale Edward Williams, Metairie, for intervenor/appellee.
Before LOBRANO and ARMSTRONG, JJ., and HUFFT, J. Pro Tem.
ARMSTRONG, Judge.
Defendants, Robert C. Berthelot and his insurer, Fire and Casualty Insurance Company of Connecticut, appeal the trial court's judgment in favor of plaintiff, Tebault Burton, finding them liable for damages sustained by plaintiff in the amount of $645,300.00, plus $36,971.60 for past medical expenses.[1]
This action grew out of a slip-and-fall in a restaurant managed by the plaintiff, the Marina Wharf Seafood Restaurant ("the restaurant"). The building housing the restaurant was owned by defendant, Robert Berthelot. Berthelot, a contractor, built the structure in 1980. It was located on the edge of a waterway and marina in St. Bernard Parish. Berthelot leased the building to a corporation solely owned by him, the Marina Wharf Seafood Restaurant, Inc. ("the corporation"), which was formed to operate the restaurant. The corporation hired plaintiff to operate and manage the restaurant for a salary and percentage of the profits.
On January 22, 1985, plaintiff slipped on the glazed tile floor of the restaurant and fell, injuring his back. Plaintiff sued Berthelot alleging that, as owner of the building, he was strictly liable for the defect in the structure which allowed condensation to form on the tile floor, creating an unreasonably dangerous condition. A jury found that a defect in the premises and a hazard or condition associated with the operation of the restaurant both contributed to the accident. Fault was apportioned 59.1% to Berthelot for the defect in his building, and 40.9% to plaintiff's corporate employer for the negligent operation of the restaurant. The total damages award was $645,300.00, which included $378,300.00 for physical and mental pain and suffering.
On appeal defendants claim that the trial court erred in: (1) failing to find that Robert Berthelot was immune from suit in tort under the Louisiana Worker's Compensation Law because he was an officer of the restaurant corporation, (2) allowing plaintiff to present evidence of a defect which had not been specifically pleaded, which was developed less than sixty days before trial, and which was not made known to defendants until the day of trial, (3) finding that a defect in the premises existed, (4) finding that plaintiff slipped and fell because of condensation on the floor rather than because of water and ice from the restaurant salad bar and, (5) finding no fault on the part of plaintiff. Defendant, Berthelot, individually, claims that the trial court erred in awarding plaintiff an excessive *653 amount of damages for physical and mental pain and suffering. Finally, in a supplemental brief filed at the request of this court, Berthelot claims that the trial court erred in failing to reduce his liability by the proportionate share of fault attributed to plaintiff's corporate employer, who is immune from suit in tort under the Louisiana Worker's Compensation Law.

TORT IMMUNITY
It is not disputed that the plaintiff slipped and fell while acting in the course and scope of his employment. Under the Louisiana Worker's Compensation Law plaintiff received benefits to compensate him for wages lost as a result of his injuries. Many of his medical expenses were also paid under the statutory scheme. His employer, the restaurant corporation, was immune from suit in tort under La.R.S. 23:1032 which provides in part:
"The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease...."
In addition to the immunity afforded plaintiff's employer, La.R.S. 23:1032 provides immunity for stockholders, officers, and directors of a corporate employer. However, this immunity is limited. The third paragraph of La.R.S. 23:1032 states in pertinent part:
"The immunity from civil liability provided by this Section shall not extend to: 1) any officer, director, stockholder, partner or employee of such employer or principal who is not engaged at the time of the injury in the normal course and scope of his employment;...."
La.R.S. 23:1032 also sets out an immunity for a principal of the employee. A principal is defined, in pertinent part, by the statute as:
"[A]ny person who undertakes to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of injury,...."
The trial court found that Berthelot enjoyed no statutory immunity under La. 23:1032 such that would protect him from plaintiff's suit in tort as the owner of the defective restaurant building. On appeal, Berthelot argues that because he is immune as a stockholder, officer, etc. of the restaurant corporation and/or as a principal of plaintiff, he cannot be sued in his capacity as the owner of the building.
The facts of the instant case are similar to those in the case of Cormier v. Guilbeaux, 547 So.2d 17 (La.App. 3rd Cir.1989), writ denied, 551 So.2d 633 (La.1989). Cormier was acting in the course and scope of his employment with a restaurant when he fell through the kitchen floor. Guilbeaux, the owner of the property upon which the restaurant was situated and the building housing it, was sued by Cormier under a theory of strict liability. Guilbeaux owned and operated a number of lounges and restaurants, and had investments in several other business ventures. Much of his business was conducted through corporations of which he was either the major or sole stockholder. One such corporation "owned" the restaurant business employing Cormier, which was conducted in the building Guilbeaux personally owned.
The trial court granted a summary judgment in favor of Guilbeaux on the ground that under the Louisiana Worker's Compensation Law Guilbeaux was immune from Cormier's suit in tort. The appellate court reversed, finding that the tort immunity provided by La.R.S. 23:1032 to stockholders, officers, and directors of corporate employers did not extend to Guilbeaux because he was not engaged in the normal course and scope of the restaurant business at the time of Cormier's injury. In other words, "his [Guilbeaux's] employment" was not the restaurant business. The appellate court found no indication *654 that Guilbeaux had any duties with respect to the management of the restaurant. The court stated, "Guilbeaux was not in the restaurant business. He was in the investment business."
In Certain v. Equitable Equipment Co., 453 So.2d 292 (La.App. 4th Cir.1984), writ denied, 459 So.2d 535 (La.1984), this court applied the same analysis employed by the Third Circuit in Guilbeaux, supra. In Certain, the plaintiff was employed by a corporation engaged in the manufacture of concrete construction pilings. He was injured at his employer's plant when a mechanized work platform or elevator on which he was standing fell to the ground. The elevator was owned by an enterprise which was a joint venture of three corporations. These three corporations were also the sole stockholders of plaintiff's employer. Plaintiff sued the three corporate stockholders in tort, arguing that, because at the time of his injury they were not engaged in the manufacture of concrete construction pilings, they were not entitled to the immunity provided under La.R.S. 23:1032. This court found that the three corporate stockholders had been engaged in the manufacture of concrete construction pilings at the time of plaintiff's injury. Accordingly, we held that the stockholders were, as required by R.S. 23:1032, "engaged at the time of the injury in the normal course and scope of [their] employment," and thus were entitled to the stockholder immunity.
In Certain, supra, and Guilbeaux, supra, the employment referred to by "his employment" was interpreted to mean the business of the employer, and necessarily, of the injured employee. Was the stockholder, officer, or director engaged in the business of the employer and employee at the time of the injury? In the instant case, the determinative issue as to Berthelot's immunity as a stockholder, officer, or director of the restaurant corporation, is whether, at the time plaintiff slipped and fell, Berthelot was engaged in the normal course and scope of the restaurant business at the time of plaintiff's injury? For the following reasons we answer that question in the negative.
Robert Berthelot owned the land on which the restaurant was built. Berthelot was a contractorhe had been one for thirty years. He acted as the general contractor for the restaurant. Berthelot personally borrowed approximately $300,000.00 to construct and furnish the restaurant. Although the building was constructed as a restaurant, Berthelot's wife, Rose, testified that they planned to find a manager and lease the building to the corporation "because [they] were not in the restaurant business." (emphasis added) Berthelot owned a number of buildings in the same area as the restaurant, but not, apparently, any other buildings which he leased to persons or entities operating restaurants.
Berthelot formed the restaurant corporation and leased the building to it for $4,000.00 per month rent. The corporation hired plaintiff to manage and operate the restaurant. The Berthelots and plaintiff set up the restaurant equipmenttables, chairs, kitchen equipment, etc. Berthelot testified that after the restaurant was set up, plaintiff "handled all the hiring and firing and everything to do with the management of the restaurant." He said plaintiff "completely took care of the restaurant." When asked if he took an active interest in the operation of the restaurant Berthelot replied, "I had an interest in it in that it was our restaurant and I ate there" he ate lunch at the restaurant approximately three days a week, and sometimes ate dinner there.
Berthelot testified that he viewed the restaurant's books "pretty much" on a regular basis. He discussed the operation of the restaurant with plaintiff only "on occasions." He said plaintiff would advise him of any maintenance problems and he would take care of them. Plaintiff testified that Berthelot did tell him to hire several people. He also said that, in addition to himself, Mr. and Mrs. Berthelot signed checks, although it was he, plaintiff, who signed them on a day-to-day basis. Plaintiff also testified that Berthelot would often adjust the restaurant thermostat, and insisted that the air conditioning be turned off after lunch customers left.
*655 The record evidence shows that Berthelot was not in the restaurant business. He was a contractor who borrowed money to invest in a restaurant. His interest in the restaurant was purely as an investor, not a restauranteur. He did not participate in the day-to-day management and operation of the restaurant. He was not engaged in the normal course and scope of the restaurant business at the time of plaintiff's injury and thus, is not entitled to the immunity provided by La.R.S. 23:1032 for stockholders, officers and directors of a corporate employer.
Defendants also argue that Berthelot is immune as a principal of plaintiff. As far as the Louisiana Worker's Compensation Law is concerned, Berthelot had no direct relationship with plaintiff. He had a direct relationship with plaintiff's employer, the restaurant corporation. Besides his relationship with the corporation as a stockholder, officer and/or director, Berthelot had a lessor-lessee relationship with the corporation. He built and furnished a building suitable for operating a restaurant, then leased it to a corporation. A lease may establish a contractual relationship which makes the lessor a principal, if by so leasing the lessor is undertaking to perform part of his trade or business by having the lessee execute it. Devane v. Board of Commissioners of Port of New Orleans, 420 So.2d 1001 (La.App. 4th Cir. 1982); Schmolke v. Krauss Company, 217 So.2d 789 (La.App. 4th Cir.1969).
The narrow issue presented, again, is whether Berthelot was in the restaurant business at the time of plaintiff's injury. For the same reasons previously discussed it is clear that Berthelot was not in the restaurant business at the time of plaintiff's injury. When Berthelot leased his the building to the restaurant corporation he was not undertaking to perform a part of his trade or business by having the restaurant corporation execute it. Berthelot is not a principal of plaintiff and is entitled to no immunity as such under La. R.S. 23:1032.
Berthelot is not immune from this suit in tort by plaintiff. We find no merit to Berthelot's arguments claiming otherwise.

EVIDENCE AS TO DEFECT NOT SPECIFICALLY PLEADED
At trial plaintiff presented as a witness, Raymond C. Bergeron, an architect. Bergeron testified that the primary cause of the moisture which formed on the tile floor of the restaurant, which plaintiff allegedly slipped on, was excessive air infiltration through the walls and window frames of the restaurant. When he began relating this testimony, counsel for defendants objected, arguing that plaintiff was attempting to enlarge his pleadings. Defendants pointed to a paragraph in plaintiff's petition which alleged that an inadequate moisture barrier between the earth and the concrete slab of the building permitted the moisture from the waterfront property to come through and collect on the tile floor. The trial court held that plaintiff's petition was sufficiently broad to inform defendants of what he claimed was the defect in the building. Defendants cite this trial court ruling as error.
La.C.C.P. art. 891 states that a petition shall:
"[C]ontain a short, clear, and concise statement of the object of the demand and of the material facts upon which the cause of action is based...."
The requirements of La.C.C.P. art. 891 are intended to give a defendant sufficient information to enable him to prepare a defense to plaintiff's allegations. See Honeycutt v. Carver, 25 So.2d 99 (La.App. 1st Cir.1946).
Plaintiff's petition stated in pertinent part:
"10. The floor of the said structure was defective, either as the result of a defect in the design or in the selection of materials and construction methods, in that there was an inadequate moisture barrier interposed between the earth and the concrete slab which permitted the moisture from the waterfront property to migrate through the components of *656 the slab and flooring material and to collect on the floor.
* * * * * *
"13. Despite specific notice of the existence of the defective condition and its potential for hazard to patrons and employees of the restaurant facility, defendant Berthelot negligently failed to take any remedial measures to render the defective condition reasonably safe, e.g.:

a) Sealing the floor with some sort of waterproof material which would prevent moisture from coming up through the concrete and accumulating on the surface of the flooring materials;
b) Laying a new floor upon furring strips with a vapor barrier formed by the dead air space between the structures of the existing floor and such new flooring materials, thus preventing the migration of water to the surface area of the floor; and/or
c) Such other feasible solutions as will be shown at trial which a reasonably prudent property owner, concerned for the safety of persons using his premises, would have taken to eliminate the unreasonably dangerous and hazardous condition resulting from the moist, slick surface of the moistened tile."
In its brief on appeal plaintiff essentially admits that he originally believed that the moisture on the floor was primarily caused by an inadequate moisture barrier as set out in paragraph 10 of his petitionat trial his expert did testify that this factor could have contributed to the problem. It was only after his expert, Mr. Bergeron, examined the building several months before trial that he learned of the air infiltration problem. Plaintiff did not amend his petition to reflect this theory.
The trial court considered paragraph 13, more specifically, subparagraph (c), as broad enough to cover other causes of moisture forming on the floor of the restaurant. A trial court has much discretion in allowing such expert testimony based upon his interpretation of the petition. However, we disagree with the trial court's interpretation of paragraph 13. Subpragraphs (a) and (b) of paragraph 13 allege that defendant, Berthelot, failed to take specified remedial measures to eliminate the condition posed by the moist, slick surface of the tile floor. Subparagraph (c) is a catch-all provision intended to cover any remedial measures which Berthelot failed to take to eliminate the condition posed by the moist floor, besides those specified in subparagraphs (a) and (b). The cause of the moist floor was alleged in paragraph 10 as the inadequate moisture barrier. Paragraph 13 only concerns actions Berthelot failed to take to remedy a dangerous condition or defectnot the cause of the condition or defect.
Defendants would have this court excise from the record any testimony regarding the air infiltration as a cause of the moist floor. Without regard to the correctness of the trial court's characterization of paragraph 13, defendants have failed to present any evidence of prejudice by plaintiff's failure to inform them of a change in their theory of the cause of the moisture on the floor.
Defendants knew the alleged cause of plaintiff's slip and fallthe immediate causewas the moisture on the tile floor of the restaurant. Defendants retained for trial, an expert in the field of mechanical engineering and air conditioning systems, William B. Martin, Jr. Martin visited the restaurant once for an inspection. Martin testified about the functions of an air conditioning system, a primary one being the removal of moisture or humidity from the air. He testified that the air conditioning system at the restaurant performed adequately in this area when it was on. He further testified that the windows of the restaurant were "very well-sealed", and that he didn't notice any conditions which might cause excessive air infiltration, the type of which would create a problem with regard to moisture forming on the floor. Defendants have not shown any prejudice because, based upon the evidence in the record, there appears to have been none. Based upon his testimony alone, one is unable to discern that defendant's expert was not retained to address the allegation *657 that the moisture was caused by air infiltration.
Plaintiff's case rests largely on the testimony of his expert. To excise this testimony concerning air infiltration as the cause of the moisture on the floor would be to effectively dismiss his suit. Because defendants have not shown any prejudice resulting from the trial court's ruling, and considering the extreme prejudice which would result to plaintiff if we were to excise Bergeron's testimony, we find that any error in the ruling was harmless.

EXISTENCE OF A DEFECT
Defendants argue that, even considering Bergeron's testimony about air infiltration, plaintiff failed to prove the existence of a defect in the premises. Plaintiff proceeded under a theory of strict liability under La.C.C. arts. 2317 and 2322. La.C.C. art. 2317 states that:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
La.C.C. art. 2322 states that:
"The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
In order to recover in strict liability under C.C. arts. 2317 and 2322 against Berthelot, as owner of the restaurant building, plaintiff had to prove by a preponderance of the evidence that a defect in the building presented an unreasonable risk of harm to him, and that he was injured as a result of that defect. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Madden v. Saik, 511 So.2d 855 (La.App. 4th Cir.1987), writ denied, 514 So.2d 131 (La.1987). See also Crowe, The Anatomy of a Tort, 22 Loy.L. Rev. 903 (1976).
An initial question raised by the defendants is whether there was a "defect" in the building. Plaintiff's expert, Raymond Bergeron, examined the restaurant building twice in late August 1988. This was three and a half years after the plaintiff's accident. Bergeron found "a lot" of deterioration in the exterior walls of the buildingsiding had deteriorated and had not been replacedand he said the lack of maintenance had allowed the caulking around the windows to dry up. He also said that it appeared that the exterior wall was originally built with knot holes in the wood which allowed light (and air) to penetrate. From this observation he "realized that there was a lot of air filtration that could easily come into [the restaurant]." Bergeron admitted that he could not say what condition the building was in at the time of the accident. But he said from the indications there, the building was not of a superior quality in terms of original construction technology. He said the construction did not minimize air infiltration. He explained that when the air conditioning is turned off at night, humid, moist outside air infiltrates into the building and condenses on the tile floor, which has been cooled by the air conditioning. He said the tile is a dense material which, when cooled, warms slowly. Bergeron said the shell of a structure should have insulation and minimal air infiltrationit should be caulked and sealed as much as possible to prevent the penetration of air through the exterior shell.
Bergeron visited the restaurant around three or four o'clock in the afternoon on each of the two occasions he inspected it. He said neither time did he observe any moisture on the floor. Based upon these observations he opined that at those times the air conditioning system "was functioning and serving the purpose," referring to offsetting the effects of any outside air infiltration.
Bergeron said that it would not be a good idea to operate the air conditioning system twenty-four hours a day to eliminate the condensation problem. He said "[i]t may be a remedy; it may not be." He said the air infiltration could be coming from the fresh air intake of the air conditioning system, but that this would indicate *658 an imbalance (defect) in the air conditioning system itself.
Defendant's expert, Mr. Martin, testified that a primary function of an air conditioning system is to remove moisture from the air. He admitted that if the air conditioning system is turned off overnight, being situated on the edge of a water body, the rise in temperature inside of the restaurant could cause a "very slight film" of moisture to form on the surface of the cool tile floor. He compared the glazed tile surface of the restaurant to a windowpane, "relatively smooth." But, he said, once the air conditioning system is turned on the problem would clear up in a short time.
Martin inspected the restaurant building only once. This inspection took place in the same general time frame as that of plaintiff's expertthree and a half years after the accident. Martin inspected the building at about the same time of day as plaintiff's expert hadapproximately four o'clock in the afternoon. At that time, Bergeron said, there was no moisture on the floor of the restaurant. He rubbed his fingers on the surface of the tile and felt no moisture. He also said when he rubbed his foot on the floor it was not slippery. He observed, in contrast to plaintiff's expert, that the double-paned windows of the building were "very well-sealed." As to the rest of the building, he didn't notice any type of excessive air leakage which would "create a problem," although he admitted he spent very little time inspecting the interior walls. When asked about the construction of the buildingas later related by Berthelot Martin said that it would provide excellent construction.
Martin said that the capacity of the air conditioning system was about seventy tons. He stated that it would affect the plan for an air conditioning system if the plans for the building called for air infiltration, although he said that it is almost impossible to make a building completely air-tight, and that an air conditioning system is supposed to bring in fresh air. However, Martin testified that it is not common for condensation to form across an entire floor surface when an air conditioning system is turned off overnight.
Defendant subcontracted out the air conditioning work to Jean Lansou. Lansou testified that he last serviced the air conditioning system in 1982. During the time he serviced the system he did not observe anything which, to his knowledge, would have affected its operation. He had never noticed any moisture on the floor and could not recall anyone ever mentioning a problem with condensation.
A waitress at the restaurant, Terrera Gravois, testified that even at the time of trial, some four years after the accident, the floor usually had moisture on it when the weather outside was "bad." But, she said, when the air conditioning and fans were turned on it dried up and was not slippery. Gravois had, herself, slipped on the moisture-laden floor on more than one occasion, and had witnessed others slip, although she did not know exactly what these others had slipped on.
A former waitress, Jan Marie Laborde, testified that she occasionally noticed moisture on the floor of the restaurant in the morning, depending on the weather. She said she couldn't see the moisture but knew it was there because it was slippery. Again, as did the other waitress who testified, Laborde said that when the air conditioning was turned on it cleared up the problem.
Ronald Pineda, a busboy at the restaurant, testified that the dining room of the restaurant, where plaintiff fell, "was always slick." Plaintiff testified that moisture began settling on the surface of the floor overnight after he began turning off the air conditioning at night at the direction of Berthelot, who was concerned about the restaurant's utility costs. He said the "heavy" moisture would evaporate after the air conditioning was turned on in the morning, but that, although not visible to the naked eye, the floor would still be moist and slippery throughout the day. On numerous occasions plaintiff observed waitresses having difficulty walking across the restaurant floor. Plaintiff personally received numerous complaints about the *659 problem and said he made Berthelot aware of it "numerous times."
Defendant, Berthelot, testified that he was aware of there being moisture on the surface of the glazed floor but said he did not consider it a "problem." He said no one ever related to him a "problem" concerning the moisture on the floor. He indicated that the cause was the humidity, and said that when the air conditioning was turned on the humidity was taken out of the building.
Defendant's own expert, Mr. Martin, testified that moisture should not form on a floor simply because an air conditioning system is turned off at night, which he said, is commonly done. Although plaintiff's expert was not able to state in exactly what condition the building was in at the time of plaintiff's accident, from the testimony of plaintiff, defendant, the dishwasher, and the two waitresses, it is clear that moisture was forming on the floor long before the day of plaintiff's accident. The record evidence supports a finding that because of a defect in the design and/or construction of the building, moisture settled on the tile floor of the restaurant. Based upon the testimony of plaintiff and the dishwasher, Pineda, the jury could have found that the non-porous glazed tile floor was usually slippery to some degree. The record evidence supports such a finding and we are unable to say that it would be clearly wrong. See Canter v. Koehring Company, 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1979).
Having found that, for some reason, the design and/or construction of the building allowed outside, humid air to filtrate into the restaurant and cause a slippery film to form on the tile floor of the restaurant, we must determine whether this defect presented an unreasonable risk of harm to the class of persons to which plaintiff belongs. A determination of this issue requires the consideration or balancing of four factors: (1) the likelihood of the harm, (2) the gravity of the harm, (3) the burden of prevention, and (4) the social utility of the building. Entrevia v. Hood, supra; Crowe, The Anatomy of a Tort, supra.
(1) The likelihood of the harm appears to have been great. Although, apparently, no one had previously fallen and seriously injured themselves, plaintiff, as well as one of the waitresses, had themselves slipped on the floor and had seen others slip on the floor.
(2) The gravity of the harm also appears to have been great. Plaintiff severely injured his back when he fell. Slipping and falling on a hard tile surface presents a very real possibility of serious injury.
(3) The only evidence as to a preventative or remedial measure was the running of the air conditioning system all night. But, this was a cost that would have been incurred by the restaurant corporation. Defendant owned the building, a defect in which caused the condensation to form on the floor. Defendant could have reached some arrangement with the restaurant corporation whereby he could reduce the monthly rent, or give a credit on the following month's rent, to compensate the corporation for increased utility costs of operating the air conditioning system twenty-four hours a day. There was no evidence as to the costs of operating the system continually, but in terms of prevention, it does not appear the burden of this measure would have been that great.[2]
(4) The social utility of the restaurant does not appear to have been that great. It provided jobs for some, but in terms of it benefitting the public, the effect was minimal.
A balancing of these factors leads us to conclude that the defective condition of the restaurant building presented an unreasonable risk of harm to the class of persons to which the plaintiff belonged.

*660 CAUSATION
Having found that a defect existed which presented an unreasonable risk of harm to the plaintiff, we must now determine whether that defect contributed to plaintiff's slip, fall and injury.
Plaintiff and the dishwasher both testified that the floor of the restaurant was always slippery. Plaintiff testified that he slipped on the moisture the day of accident. Defendant and both waitresses testified that the floor was moist only on occasion. Both waitresses testified that the floor was not slippery from condensation on the day of the accident. Both waitresses, neither of whom saw plaintiff slip and fall, but instead turned to see him on the floor, testified that there was water on the floor in the area where plaintiff fell, near the salad bar. One said there was a "little" puddle of water. However, the other denied there had been a puddle, only a "few" droplets. Pineda, the dishwasher, testified there was no ice or water on the floor, just the normal coating of moisture.[3]
Defendant maintains that the plaintiff slipped on this water. He alleges that the water was deposited on the floor during the icing of the salad bar. During the icing process ice would be scooped from a cart into the salad bar. Both waitresses testified that it was common for ice and/or water to spill on the floor during this procedure. This fact was not seriously disputed by plaintiff. However, plaintiff and the dishwasher both testified that a rubber-backed commercial carpet-type mat was in front of the salad bar at the time of this accident to absorb any spilled ice or water. Plaintiff testified that the mats were exchanged and placed in front of the salad bar twice weekly by a local linen service; he said the restaurant had been using these mats as long as they had been offering the salad bar. However, both waitresses testified there had not been a mat in front of the salad bar on that date because the restaurant did not begin using them until after plaintiff's accident.
Both waitresses testified that after plaintiff fell he "fussed" at them "for having the ice on the floor by the salad bar." Neither waitress remembered who Ronald Pineda was, the dishwasher who claimed he was the first to assist plaintiff after he fell. Pineda remembered working with both waitresses but could not recall whether they were even working on the day of the accident.
The jury obviously made a credibility call as to the causation issue. It did not believe the testimony of the two waitresses. One reason for this may have been evidence of possible bias on the part of one of them. When asked about her feelings toward the plaintiff, Terrerra Gravois said, "I didn't like the way he talked to people, his waitresses." Both she and Ms. Huff signed statements about the accident at the behest of plaintiffin the brief statements the two women merely said they had witnessed the accident. Gravois testified that she did not want to sign the statement but did so out of fear of losing her job.
Considering the evidence as a whole, we are unable to say that the apparent factual finding by the jury that plaintiff slipped on the film of moisture coating the glazed tile floor of the restaurant is not supported by the evidence or is clearly wrong. Canter v. Koehring Company, supra; Arceneaux v. Domingue, supra.

APPORTIONMENT OF FAULT
The jury assessed percentages of fault at 59.1% to the defendant, Berthelot, and 40.9% to the restaurant, specifically, a *661 "condition" or "hazard" "associated with the operation of the restaurant." Defendants argue that, because the jury made this finding and assessed this percentage of fault to the operation of the restaurant, it should have assessed some percentage of fault to the plaintiff, individually. Defendants submit that the jury may have found that the condition associated with the restaurant was the drippage of ice and water onto the floor, or the failure to "properly" run the air conditioning system.
Defendants claim that because he was responsible for the operation of the restaurant, plaintiff was derelict in his duty to keep the floors safe for normal passage or to properly operate the air conditioning system, and therefore, was at fault in causing his own accident.[4]
Defendants' argument is somewhat misplaced. It is impossible to divine what the jury had in mind when it assessed fault. However, based solely upon the assessment, we are unable to infer factual findings such that would necessitate our reapportionment of fault. The jury could have found that defendant, Berthelot, acting in some corporate capacity, ordered, as plaintiff testified he did, that the air conditioning system be turned off overnight. In other words, plaintiff was following a corporate directive when he turned off the system at night. This could be a basis of liability for the 49.1% of fault assessed to the restaurant corporation. If plaintiff was acting at the direction of his employer he cannot personally be faulted for doing so. We find no merit to this argument.

DAMAGES
In a brief filed on behalf of Berthelot, individually, he argues that the trial court erred in awarding excessive damages for physical pain and suffering, $290,000.00, and mental pain and suffering, $87,500.00, a total of $378,300.00. Defendants also contend that the award for future medical expenses, $137,000.00, was excessive.
1. General Damages
A trier of fact has much discretion in the assessment of general damages. La.C.C. art. 2324.1; Landy v. Smith, 542 So.2d 731 (La.App. 4th Cir.1989). Before an appellate court can disturb a trial court's award of general damages, the record must clearly reveal that the trier of fact abused its discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Harris v. Doucette, 539 So.2d 997 (La.App. 4th Cir.1989). If such abuse of discretion is found, then the court may look to other awards made in similar cases as an aid to raising or lowering the award to the highest or lowest point which would have been reasonably within the discretion of the jury. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Harris v. Doucette, supra.
Prior to the accident in question, plaintiff had twice undergone back surgery. In 1978 he had a lumbar disc removed. In 1980 he had more disc material removed. Plaintiff testified that he had recovered after the 1980 surgery to the extent that he was running in marathon races. He said he often jogged the five miles from his residence to the restaurant. Plaintiff testified, and related to his psychiatrist, that he was a former boxer and prided himself on being physically fit.
Following the accident in question plaintiff sought chiropractic care. When that failed to help he sought treatment by Dr. Kenneth Vogel, a neurosurgeon who had previously operated on his back. Dr. Vogel saw plaintiff on March 19, 1985. An initial examination revealed a suspected herniated disc. A CAT scan confirmed a herniated disc at the L-5, S-1 level of plaintiff's spine. Subsequently, Dr. Vogel operated to remove the disc at that level, and performed a neurotomyhe severed the nerve causing plaintiff pain. Dr. Vogel said that because this was plaintiff's third back surgery, he only had a 50% chance of recovery. Dr. Vogel treated plaintiff for approximately ten months after the surgery. Plaintiff continued to complain of pain, he *662 continued to have muscle spasman objective symptom. Dr. Vogel noted that plaintiff complained of leg pain after the third surgery, something he had not mentioned after the previous surgeries. He felt that the leg pain indicated some degree of nerve root irritation which he called, "a striking difference from [19]82." To have excellent results he said almost all of the leg pain should be resolved. He said the prognosis was "not satisfactory" for plaintiff's recovery.
Based upon the history given by plaintiff, Dr. Vogel felt that "in all probability" the slip and fall at the restaurant was the cause of his recurrent herniation. After the 1980 surgery he had given plaintiff a 10-15% permanent partial disability. He increased this by 10% after the third and last surgery.
Plaintiff also sought treatment by an orthopedist, Dr. Robert E. Ruel, Jr. Dr. Ruel first examined plaintiff in October 1985. His exam at that time revealed diminished lumbar motion; it was limited to about 50% of normal. An April 1986 exam revealed sciatica in both of plaintiff's legs, which he said, is indicative of nerve pressure in his lower back. Plaintiff continues to suffer from this irritation. At the time of trial Dr. Ruel had treated plaintiff fifty-one times and said plaintiff remains under his care. He said plaintiff has had one hundred and seventy-four physical therapy sessions as of the time of trial.
Dr. Ruel said that plaintiff has periods of relief and periods of pain. He has prescribed plaintiff mild pain medication as well as sleeping medication. He said plaintiff continues to have severe limitation of back motion. Dr. Ruel testified that because of plaintiff's three surgeries, he has an unstable back, and said that excessive movement can cause irritation on the nerve and result in pain. Dr. Ruel recommended a spinal fusion to stabilize plaintiff's back. However, he could not guarantee that such an operation would be successful. Plaintiff has so far declined to have this operation. Dr. Ruel said that with or without the fusion he expects plaintiff to experience back problems the rest of his life.
Dr. Ruel testified that plaintiff has had problems with severe depression. He recommended that plaintiff see a psychiatrist and plaintiff has been receiving such treatment since March 1988. Dr. Ruel sent plaintiff to be evaluated by a psychiatrist because of his diminished sex drive. He said the problem had no organic causeit was depression.
Dr. John R. McGregor, Jr., a psychiatrist, has been treating plaintiff for a moderate to severe depressive anxietey neurosis since February 1988. He listed some of the symptoms as: depressive moods, irritability, pent up anger, temper outbursts, loss of interest in previously enjoyed activities, social isolation and withdrawal, overeating and gaining weight, decreased sex drive and impotence, and suicidal thoughts. After his initial exam he felt that plaintiff needed extensive psychotherapy with a frequency of three times per week. He prescribed mild tranquilizers and anti-depressants but said they had an adverse affect on the plaintiff and were discontinued.
Dr. McGregor testified that plaintiff's major symptom was pent up anger dealing with his back injury which was causing him significant physical pain and preventing him from doing the things he used to do. He said that plaintiff's lifestyle was "completely upended" by this last back injury. Dr. McGregor said that plaintiff apparently took great pride in his physical prowess, running miles and miles everyday and staying in superb physical condition. Plaintiff lost self-esteem and self-confidence in not being able to work out and keep fit. This caused him to isolate himself in his home and not socialize, which had been a major part of his life until then. Plaintiff related that in social situations people would notice the dramatic change in him and question him about his accident and injuries. Dr. McGregor testified that this tended to depress plaintiff more, and cause an even greater loss of self-esteem. Dr. McGregor said the root cause of plaintiff's mental problems was his slip and fall in the restaurant in January 1985.
Dr. McGregor testified that plaintiff cooperates with his plan of treatmenthe is *663 very candid at therapy sessions and works hard to try and understand his problems. Despite this, however, he said that plaintiff's condition has deteriorated since he began treating him. When asked if he saw the need for continued treatment Dr. McGregor replied, "very much so." He said he had no hopes of curing plaintiff and said, "I think I have a lifetime case on my hands." As to plaintiff's need for future surgery to fuse his spine, Dr. McGregor said that candidates for surgery generally do not do well if they are depressed or anxious at the time of surgery. He also said that when plaintff was told he would have to have a spinal fusion at some point, he broke down and cried.
Plaintiff testified that after his 1980 surgery he jogged, ran in marathon races, played racquetball, swam, and played basketeball with his son. He never missed any work because of his back. He worked seven days a weekup to seventy hours a week. He said he cannot do the things he used to and suffers from pain constantly. Somedays are just better or worse than others he said. He went to see Dr. McGregor on the recommendation of Dr. Rule and because he thought perhaps that the pain was "in his head." He said he is very anti-drug and takes only Darvocet, Tylenol, and aspirin for pain.
Defendants presented no expert testimony on plaintiff's physical or mental condition. The evidence shows a person whose mental health has been tremendously impacted for the worse by this slip and fall. Considering this evidence we are unable to find that the $87,000.00 award for mental pain and sufferingpast, present, and future was an abuse of the jury's great discretion.
The extreme impact on plaintiff's mental health is clearly rooted in his physical condition brought about by the accident at the restaurant. Defendants offered no real evidence that plaintiff is malingering; while much of his pain is subjective, there are concrete objective symptoms present. Plaintiff suffers constant pain. There is no conclusive evidence that a spinal fusion will relieve the pain. Plaintiff will continue to suffer from back pain for the rest of his life because of this accident. His disability rating, according to Dr. Vogel, almost doubled after this last accident and surgery from 10-15% to 20-25%.
While the $290,000.00 award for physical pain and suffering may be on the upper end of the scale for injuries of this type, based upon the facts of this case we are unable to say that the award was an abuse of the jury's great discretion.
2. Future Medical Expenses
Defendant argues that based upon the "highly speculative nature" of the testimony presented at trial, the jury award of $137,000.00 for future medical expenses was an abuse of discretion.
Future medical expenses must be established with some degree of certainty. Wilson v. MaGee, 359 So.2d 315 (La.App. 4th Cir.1978), modified on other grounds, 367 So.2d 314 (La.1979). However, an award of future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir.1974).
In his brief on appeal defendant cites a figure of $25,000.00 to $30,000.00 for a future spinal fusion and aftercare by Dr. Ruel.
Dr. McGregor testified that the plaintiff was a "lifetime case." He testified that plaintiff would continue to require intensive therapy three times a week. He said each session cost $115.00, with a yearly increase of $5.00 per session. He estimated that yearly treatment costs would run at least $12,000.00-$15,000.00. Based upon the $115.00 figure, at three sessions per week, fifty weeks per year, the yearly cost would be $17,250.00. Even at the lower figure of $12,000.00 per year, the full award of $137,000.00 would provide for approximately eleven and a half years of psychiatric treatment. After subtracting future medical expenses for the fusion by Dr. Ruel, the $112,000.00 would provide only nine and a half years of treatment at $12,000.00 per year.
*664 Considering that the estimate of future medical expenses is necessarily somewhat speculativeperhaps this is even more true in the case of expenses for future psychiatric treatment than it is for physical treatmentwe are unable to say that the total award of $137,000.00 was an abuse of the trial court's discretion or was not supported by the evidence.

EMPLOYER FAULT
The jury apportioned fault at 40.9% to plaintiff's employer, the restaurant corporation, 59.1% to third-party tortfeasor, Robert Berthelot, individually. Because plaintiff's sole remedy against his employer lay under the Louisiana Worker's Compensation Law, he is not able to recover damages from the corporation under tort law. In supplemental briefs filed in this court, defendant, Berthelot, individually, seeks to have this court reduce his liability as a third-party tortfeasor from 100% of the plaintiff's damages to his proportionate share of fault, 59.1%. In other words, defendant asks that we reduce his liability by the proportion of fault assessed to plaintiff's employer.
Defendant's argument is premised upon comparative fault principles contained in La.C.C. arts. 2323 and 2324. La.C.C. art. 2323 provided at the time of plaintiff's accident that damages recoverable by a contributorily negligent plaintiff would be reduced by the proportion of fault attributed to him. La.C.C. art. 2324 provided at the time of plaintiff's accident that the liability of a joint tortfeasor could be reduced to his proportionate share of fault if it was less than that attributed to a contributorily negligent plaintiff.[5]
In the instant case the jury determined and we have found support for that determinationthat the plaintiff was not contributorily negligent. Therefore, there is no issue as to whether the defendant can have his liability to plaintiff affected by the fault attributed to plaintiff's employer, the restaurant corporationhe cannot. Under La.C.C. arts. 2323 and 2324, as in effect at the time of plaintiff's accident, defendant could not have had his liability to plaintiff reduced by fault attributed to any joint tortfeasor, whether employer or third-party tortfeasor.
Although defendant mentions the idea of indemnity or contribution between himself and the restaurant corporation, in his prayer he only requests that his liability to plaintiff be reduced by the fault attributed to the employer/corporation. Nevertheless, we reject the idea of contribution or indemnity between a negligent employer and a third-party tortfeasor. One of the basic principles underlying the worker's compensation system is that the liability of an employer for the job-related injuries of its employee is limited to compensation benefits. Allowing a third-party tortfeasor the right to seek contribution and indemnity from the employer would offend this basic principle. See generally, Gifford v. Aurand Manufacturing Company, 207 So.2d 160 (La.App. 4th Cir.1968), writs denied, 252 La. 113, 209 So.2d 41 and 252 La. 115, 209 So.2d 41 (1968); LeJeune v. Highlands Insurance Company, 287 So.2d 531 (La.App. 3rd Cir.1973), writ denied, 290 So.2d 903 (La.1974).
For the foregoing reasons, we affirm the judgment of the trial court in all respects.
AFFIRMED.
HUFFT, J. Pro Tem. concurs.
NOTES
[1] Intervenor, Aetna Life & Casualty Company, the worker's compensation insurer for plaintiff's employer, The Marina Wharf Seafood Restaurant, Inc., obtained a judgment against plaintiff for $32,745.70 it paid as worker's compensation benefits, and $36,971.60 it paid as medical expenses.
[2] It must be remembered that the cause of the condensation was not the failure to continually operate the air conditioning system; it was the design and/or construction of the restaurant. Defendant's own expert testified that he would not have recommended operating the air conditioning system twenty-four hours a day.
[3] Defendants claim that Pineda's eyesight was poor. Pineda admitted that he could not read the order tickets in the restaurant's kitchen and so was assigned duties as a dishwasher. At trial he could not discern the pattern of defense counsel's tie at a distance of eight to ten feet. This should not affect his credibility as to his testimony about the moisture on the floor because he said it was "always slick." One definition of slick is slippery. Webster's II New Riverside Dictionary (1984). Slipperiness is sensed not by sight, but by touchsuch as the touch of one's shoe to the slippery surface of the floor. There was testimony by plaintiff that the residual slippery film was not visible. A defense witness, one of the waitresses, also testified that the moisture, though not visible, was slippery. The condition of Pineda's eyesight could, however, affect his credibility as to his recollection of ice or water being on the floor.
[4] Defendants make no argument as to plaintiff's assumption of the risk.
[5] Although La.C.C. art. 2324 was amended in 1987, the amendment is a change in the substantive law, and therefore, is to be applied prospectively only. See La.C.C. art. 6; Morrison v. J.A. Jones Construction Company, Inc., 537 So.2d 360 (La.App. 4th Cir.1988).