631 So.2d 547 (1994)
Nell GASTON,
v.
G & D MARINE SERVICES, INC., et al.
No. 93-CA-0182.
Court of Appeal of Louisiana, Fourth Circuit.
January 19, 1994.
*549 Stephen B. Murray, Charles R. Ward, Jr., Murray Law Firm, New Orleans, for plaintiff-appellee.
James M. Tompkins, J. Michael Grimley, Jr., Galloway, Johnson, Tompkins & Burr, New Orleans, for defendant-appellant.
Before KLEES, ARMSTRONG and JONES, JJ.
ARMSTRONG, Judge.
Defendant G & D Marine Services, Inc. (G & D), appeals from a judgment in favor of plaintiff Nell Gaston, who was awarded damages for injuries sustained in an accident while preparing to get off of a crewboat which had transported her across the Mississippi River. We now amend the judgment of the trial court.
Plaintiff was a fifty-six year old female at the time of the incident in question. She worked as a head steward or cook for SHRM Catering which had a contract with Chevron, U.S.A. to provide catering services to a Chevron facility located on the east bank of the Mississippi River across the river from Empire, Louisiana. G & D had the contract to transport SHRM personnel from the Cal-Ky dock in Empire, on the west bank of the Mississippi River, to the Chevron facility. On November 15, 1988 plaintiff had finished her two-week hitch at the Chevron facility and boarded a fifty-foot crewboat owned and operated by G & D, the M/V MISS VIVIAN, to be transported across the river to the Cal-Ky dock. The captain of the M/V MISS VIVIAN was Riley Terrebone. The only other passenger was Kristi Guidry, plaintiff's galley hand.
Upon reaching the Cal-Ky dock Capt. Terrebone backed his vessel to the dock and attempted to hold it there by keeping the engines in reverse, rather than by tying the vessel to the dock. Kristi Guidry exited the vessel first. As plaintiff was bending over to pick up her suitcase, she claimed that movement of the vessel bumping against the dock caused her to "crunch down." Although she felt a sharp pain in her back, plaintiff proceeded to pick up her suitcase and exit the vessel. She entered her automobile and dropped Ms. Guidry off enroute to her sister's residence in Gretna, Louisiana. Plaintiff testified that she felt constant pain after the accident. She sought treatment from Dr. Earl J. Rozas the next day. Dr. Rozas hospitalized plaintiff for several weeks and was still treating plaintiff at the time of trial, over three years later.
Dr. Rozas testified by deposition that on examination of plaintiff he found muscle spasm in her lower back and stated that a straight leg raising test on her left leg was positive for pain. He said these findings were consistent with the history reported by the plaintiff, i.e., a sharp pain in her lower back and severe pain in her left leg with numbness. X-rays and CAT scans showed "fairly advanced" degenerative arthritic changes in her lumbar spine and narrowing of two disc spaces, one at the L3-L4 level and one at the L5-S1 level. Dr. Rozas diagnosed plaintiff to be suffering from a herniated disc with sciatica in her left leg and lumbar strain. It was his opinion that the incident on the M/V MISS VIVIAN aggravated plaintiff's pre-existing degenerative arthritic problems and cause them to become symptomatic.
Dr. Rozas stated that at first he did not focus on plaintiff's left knee but on her whole left leg which she complained was in pain and numb. She had no specific complaints regarding the left knee when he first saw her. Dr. Rozas's December 14, 1988 office notes show plaintiff complaining of knee pain. As of January 25, 1989 plaintiff's knee pain had worsened. An arthrogram showed no evidence of a torn cartilage. An MRI ordered on March 1, 1989 showed degeneration between both the medial meniscus and the lateral meniscus. An arthroscopic examination done on June 26, 1989 showed no tear of either meniscus but revealed extensive chondromalacia in the left knee. Arthroscopic surgery was performed to shave off some damaged cartilage. It was Dr. Rozas's opinion that most of this chondromalacia preexisted the accident. However, based on plaintiff's symptoms, he felt that something in the accident aggravated this pre-existing condition.
*550 Dr. Rozas felt that at the time of the accident plaintiff had fallen and struck her knee or had sustained a rotational type of injury. Plaintiff actually did not report any type of injury to her knee. Dr. Rozas testified that at the time of trial plaintiff still complained of pain in her knee and back. He said she had consistently complained of pain in her knee and back. Dr. Rozas felt that the pain would never go away. He believed that because of the pain plaintiff would not be able to work on a sustained basis, although he gave her only a fifteen percent whole body disability rating.
Dr. Terry Habig testified as an expert in the field of orthopedic surgery on behalf of defendant. Dr. Habig admitted that the incident may have aggravated plaintiff's preexisting degenerative problems in her back and indicated that she could have strained her back to some extent by sagging forward because of the motion of the vessel. However, he did not believe that motion could have caused plaintiff's knee injury. As for plaintiff's ability to return to work, Dr. Habig felt that because of plaintiff's symptoms it would be hard for her to do things requiring much standing or walking. He thought she would be limited to sedentary work. He did believe, however, that plaintiff complained of pain more than one might anticipate considering her x-rays.
Plaintiff testified that as she reached down to pick up her suitcase, which she estimated to weigh approximately 12-17 pounds, she went down, i.e., "crunched down," further than she would have due to movement of the vessel. Plaintiff stated that she never had the types of back and knee problems that she has had subsequent to the incident in question. She testified that her work as a steward cooking for approximately thirty-five people a day required her to frequently bend over, and to lift large pots and groceries. Counsel for defendant noted that in an earlier deposition plaintiff stated that as she was bending down to get her suitcase she was pushed down by the motion of the vessel and that she felt the sharp pain as she picked up her suitcase. She also stated that she did not twist to the right or left. Defendant emphasizes that plaintiff stated that she felt the sharp pain as she picked up the suitcase, not as she was "crunched down" or "pushed" down by the movement of the vessel.
Plaintiff admitted that the docking method used by Capt. Terrebone on the day of the accident, holding the stern of the vessel against the dock by the force of the engines in reverse, was really no different than the way he always dropped them off. She further admitted that she had never had any problems disembarking when the vessel was held against the dock. Plaintiff did not complain to Capt. Terrebone on the day of the accident and admitted that she turned around and waived to the captain after she got off of the vessel. She also admitted that when she first went to Dr. Rozas for treatment she did not relate the injury to anything happening with the vessel, only that she hurt her back as she bent down to get her suitcase.
Kristi Guidry, plaintiff's galley hand who rode across the river with her on the day of the accident, stated in her deposition that plaintiff did not mention any problems to her. They got off the vessel and plaintiff drove her to a location, got out of her vehicle, and opened the trunk so Guidry could get her suitcase. Guidry said she did not notice plaintiff having any difficulty moving around. Guidry said she was "shocked" when she learned the next week about plaintiff's injury. She confirmed that Capt. Terrebone usually let them off the vessel while holding the stern against the dock by the force of the engines.
Jeannette Beard was employed by SHRM Catering, Inc. Beard worked with plaintiff for approximately one year and roomed with her while on the job. She testified that she had heard plaintiff complain of pain "on many occasions" prior to November 1988. She said plaintiff had gained weight after she came to work at SHRM and that plaintiff quit an exercise program because it bothered her back and the back of her legs. Beard claimed that plaintiff told her that she had to take "something for pain" and that her physician said she had to lose weight because it was causing her back problem. Plaintiff denied having prior back and leg problems. *551 She denied telling Jeannette Beard any of the things Beard said she told her.
Capt. Claude Davenport testified on behalf of plaintiff as an expert in the field of marine safety. Capt. Davenport stated that Capt. Terrebone should have pulled the M/V MISS VIVIAN alongside the dock and tied the vessel up with lines, then, when the vessel settled down, told the passengers they could get off. There were tires affixed to the stern of the M/V MISS VIVIAN. Davenport stated that the tires would cause the vessel to bounce back and forth as Capt. Terrebone tried to keep the stern backed up against the dock. Capt. Davenport explained that when trying to keep the stern of the vessel against the dock, the current of the river tends to move the bow or front end of the vessel, requiring adjustments of the engines. He also said the force of the engines can make the pilings of the dock move. He said Capt. Terrebone's technique causes the vessel to constantly bump against the dock. Capt. Davenport also noted that it was Chevron company policy to secure the vessel to the dock. Capt. Davenport testified that secured means tied up.
On cross-examination Capt. Davenport admitted that even if a vessel is tied up you will get some vertical motion when, for instance, a vessel passes by. It was his understanding that on the day of the accident there were no waves in the vicinity of the vessel and dock, and that there were no passing boats. He also said the river is usually low in November and estimated the river current at twothree knots.
Capt. Sheldon Hild testified on behalf of defendant as a marine safety expert. Capt. Hild felt it was safe and prudent to back up to the dock and hold the vessel there by use of the engines "if it's done properly." He said, in contrast to Capt. Davenport, that the tires on the vessel actually had a dampening effect on motion of the vessel. Capt. Hild stated that holding a vessel against the dock by the force of the engines would have a greater dampening effect on the bumpingtype of movement than simply tying up a vessel. He said that you cannot tie a vessel to a dock rigidly, and that there is always a certain amount of give in the lines. Capt. Hild testified that, depending on the water, there would be some horizontal and vertical movement and that a passenger on the deck of a vessel, whether tied or backed up by the power of the engines, can reasonably expect to encounter some involuntary movement of his body. As for the Chevron safety notice posted in the M/V MISS VIVIAN, Capt. Hild said that the word "secure" as used in the notice could refer to tying up the vessel or to holding the vessel against the dock by the force of the engines.
On rebuttal, plaintiff called Capt. Davenport who testified that the term "secure" was defined in the Encyclopedia of Nautical Knowledge (Cornell Maritime Press) as "[t]o make fast, stow, or lash in place as a boat, movable cargo, a spar, a gun etc." A copy of the definition was introduced in evidence. He said holding a vessel by the engines is not securing, that secured means "tied up with lines." He again reiterated that while holding the stern of a vessel against a dock, at least as in the instant case where the vessel is perpendicular to the river, the bow of the vessel may have a tendency to swing out because of the river current. To compensate for this tendency to swing out, the captain would have to increase engine rpm's or change the engine speed which would cause the vessel to move.
John Garnett, a one-half owner of G & D Marine, testified that Capt. Terrebone normally would hold the stern of the M/V MISS VIVIAN against the dock rather than tying the boat to the dock. He said he had never seen the vessel making the "bumping motion" described by plaintiff. He said that when the vessel is held against the dock by the engines there is no movement but that when it is tied up it can drift in and out. Garnett said that he had never received any complaints or had any problems during five years of Capt. Terrebone offloading passengers by holding the stern of the vessel against the dock by the force of the engines. He interpreted the Chevron notice as meaning that the vessel is secured to the dock when "it's backed up or in gear."
The deposition of John Christopher Brown was introduced in evidence. Brown was the safety manager for SHRM Catering and had *552 served in that same capacity with Oceanic Butler, SHRM's predecessor company. Brown stated that plaintiff had complained to him of "basically non-specific back pain" prior to her alleged accident. Brown also stated that at least one of plaintiff's company physical examinations before her accident showed arthritic spurring, but admitted that there had never been any complaints regarding plaintiff's ability to perform her work. Brown interviewed plaintiff following her accident and he said she did not mention that the movement of the vessel caused or contributed to her accident. Brown had conducted safety meetings which plaintiff had attended. At one of those meetings Brown handed out a brochure on back care, including tips on proper lifting. Brown stated that, based on plaintiff's description of how she lifted her suitcase, it was his opinion that she had lifted her suitcase improperly.
Following the taking of evidence the trial court found that plaintiff's back and knee injuries were caused and/or aggravated when the motion of the M/V MISS VIVIAN caused plaintiff to abruptly twist her back and knee as she reached for her suitcase. The trial court found that the vessel should have been secured to the dock "which is in keeping with prudent seamanship as well as being a requirement of G & D Marine safety policy." The court awarded general damages in the amount of $100,000.00, medical expenses in the amount of $32,303.93, $52,405.00 for past lost wages and $54,361.00 for future lost earning capacity, plus interest and costs.
On appeal defendant raises four assignments of error, three of which address the trial court's finding of negligence on the part of defendant.

NEGLIGENCE
Defendant first argues that the trial court applied the wrong standard of negligence, that being "prudent seamanship." While the trial court did refer to prudent seamanship in her reasons for judgment, we are not thereby convinced that she applied the wrong standard of negligence. Therefore, we will not perform a de novo review, rather we will review the trial court's implicit finding of negligence applying the normal standard of review employed in general maritime cases, whether reasonable persons could have arrived at a contrary verdict. Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4th Cir.1992), writ denied, 613 So.2d 996 (La. 1993), cert. denied, ___ U.S. ___, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993); Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La. 1986); Fontenot v. Teledyne Movible Offshore, Inc., 714 F.2d 17 (5th Cir.1983). Factual findings made by the trial court in a claim under the general maritime law are reviewed under the clearly erroneous standard. Daigle, supra; Parks v. Dowell Div. of Dow Chemical Corp., 712 F.2d 154 (5th Cir.1983). The clearly erroneous standard of appellate review is the same manifestly erroneous or clearly wrong standard of review employed by Louisiana appellate courts in reviewing factual findings of lower courts. Canter v. Koehring Co., 283 So.2d 716 (La. 1973). This deferential standard of appellate review applies not only to factual findings based on the testimony of live witnesses, but also factual conclusions based on depositions and documentary evidence. Virgil v. American Guarantee and Liability Insurance Co., 507 So.2d 825 (La.1987).
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), the Louisiana Supreme Court commented on the clearly erroneous standard as applied to factual findings based largely on the credibility of fact witnesses. The court stated:
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, *553 and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

(Citations omitted.)
It is a settled principle of general maritime law that a shipowner owes the duty of exercising reasonable care toward those lawfully aboard the vessel who are not members of the crew. See Duplantis v. Farm Bureau Ins. Co., 486 So.2d 974 (La.App. 1st Cir.1986). Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Gibboney v. Wright, 517 F.2d 1054 (5th Cir.1975). This duty of reasonable care encompasses a shipowner's duty to provide a safe manner of ingress and egress from his vessels. Guillory v. Cameron Offshore Services, Inc., 422 So.2d 592 (La.App. 3d Cir.1982). This duty should encompass a duty on the part of the vessel owner or his agent, in this case Capt. Terrebone, to insure that the vessel is secured before passengers are allowed to disembark.
Although there was conflicting evidence on whether Capt. Terrebone should have tied up the M/V MISS VIVIAN to the dock before allowing plaintiff to disembark, the evidence was sufficient to support a finding that he should have done so, and that the failure to do so was a breach of the duty of reasonable care. We are unable to say that the trial court was clearly wrong in implicitly reaching that conclusion. Further, there was evidence from which the trial court could have found a causal connection between the captain's failure to tie up the vessel and plaintiff's injuries. Dr. Rozas found it more probable than not that there was a causal connection between the accident and the aggravation of the pre-existing back and knee conditions. Dr. Habig, defendant's expert witness, admitted there was a possible causal connection between the accident scenario as described by plaintiff and the aggravation of her pre-existing back condition, but not the knee injury.
Although defendant stresses that plaintiff felt pain as she picked up her suitcase, the evidence supports a finding that the movement of the vessel, caused by the bumping motion of the vessel against the dock, caused her to bend down farther than she normally would have when she picked up the suitcase. The evidence supports a finding that this hyper extension as a result of the motion of the vessel caused the aggravation of the back and knee conditions. We cannot say such findings would be clearly wrong. Although plaintiff herself stated that she did not twist her back or knee, and the trial court erred in finding otherwise, the record evidence supports the trial court's ultimate finding of liability under the theory of negligence advanced by plaintiff.

CONTRIBUTORY NEGLIGENCE
Defendant maintains that plaintiff was contributorily negligent in improperly lifting her suitcase. While the trial court made no finding regarding contributory negligence, implicitly, it found none. Defendant cites the testimony of John Brown who stated in his deposition that he believed plaintiff lifted her suitcase improperly. This opinion was based on plaintiff having related the details of the accident to Brown. On the other hand, there is the testimony of plaintiff who had been bending over and lifting large cooking pots and groceries for years in the course of her duties as a steward cooking for large numbers of people.
We have already determined that the trial court found that G & D was negligent. The burden was thus shifted to defendant to prove that it was more probable than not that plaintiff herself was contributorily negligent. We are unable to say that the trial court would have been clearly wrong to find no contributory negligence, even considering the testimony of John Brown that plaintiff improperly lifted the suitcase. We note that there was no testimony that it was more probable than not that any such improper lifting contributed to or caused the aggravation of the back and knee conditions. Therefore, we find no merit to this assignment of error.

QUANTUM

1. General Damages:
Defendant submits that the award of general damages to plaintiff, $100,000.00, *554 was excessive. Before an appellate court can disturb a trial court's award of general damages, the record must clearly reveal that the trier of fact abused its discretion in making the award. Only after finding that the record shows that the trial court abused its discretion can the appellate court disturb the award, and then only to the extent of raising or lowering it to the highest or lowest point which would have been within the discretion afforded the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, 373 So.2d 498 (La.1979); Burton v. Berthelot, 567 So.2d 649 (La.App. 4th Cir.1990), writ denied, 569 So.2d 989 (La.1990). Before an appellate court questions a trial court award as inadequate or excessive it must look not to prior awards but to the individual circumstances of the instant case. Reck v. Stevens, supra; Burton v. Berthelot, supra. The basic question to be considered is whether the general damage award is so high as to shock the conscience of the reviewing court. Bourgeois v. Puerto Rican Marine Management, Inc., 589 So.2d 1226 (La.App. 4th Cir.1991), writs denied, 592 So.2d 1299, 1300 (La.1992). See also Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
Despite evidence of plaintiff's preexisting degenerative conditions in her back, she was working and, according to her testimony, had no pain symptoms prior to the accident. Dr. Rozas testified that plaintiff can no longer do the type of work she was doing at the time of the accident and which she had been doing for eight years before the accident. She claims she is in constant pain and Dr. Rozas testified that this will not change. Plaintiff was hospitalized immediately following the accident and later for arthroscopic surgery on her knee. She underwent physical therapy, trying various methods to reduce or manage her pain, none of which provided more than temporary relief.
The award of $100,000.00 in general damages in this case is clearly on the high side. However, we are unable to say that it is a clear abuse of discretion or so high as to shock the conscience.

2. Future Lost Wages:
Defendant claims that the trial court erred in awarding damages for future lost wages because it failed to factor in deductions for income and Social Security taxes that plaintiff would have paid had she continued to work, as required under the general maritime law. Defendant is correct. See Jenkins v. Kerr-McGee Corp., 613 So.2d 1097 (La.App. 3d Cir.1993), writs denied, 616 So.2d 701, 702 (La.1993); Madore v. Ingram Tank Ships, Inc., 732 F.2d 475 (5th Cir.1984).
The trial court awarded plaintiff $54,361.00 for future lost wages. That figure was calculated based on gross earnings by plaintiff's economist, Dr. Melville Z. Wolfson. Dr. Wolfson also made a calculation factoring in deductions for income taxes and Social Security taxes. That figure was $46,570.00. Defendant also submits that Dr. Habig was correct in stating that plaintiff was able to return to sedentary work. Plaintiff was fifty-nine years old at the time of trial. She had a ninth grade education with no other vocational training. Prior to plaintiff's beginning to work as a steward she had worked only in convenience stores as a cashier/stock clerk.
There was no evidence presented as to any type of work available for plaintiff with her limitations. Considering all of the evidence, we are unable to say that the trial court erred in not finding that plaintiff could work at sedentary minimum wage employment and in not reducing the award of future lost wages by such an amount. We will reduce the award for future lost wages to $46,570.00, to allow for deductions for income and Social Security taxes.

INTEREST
Defendant claims the trial court erred under general maritime law in awarding prejudgment interest on the award for future lost wages and the portion of general damages awarded for future pain and suffering. In her brief on appeal plaintiff agrees with this assertion. O'Bryan v. Folk Construction Co., 594 So.2d 900 (La.App. 4th Cir. 1991), on rehearing; Theriot v. McDermott, *555 Inc., 611 So.2d 129 (La.App. 1 Cir.1992), writ denied, 615 So.2d 342 (La.1993).
We will amend the judgment of the trial court to eliminate the award of interest for future lost wages. The trial court did not apportion the award for general damages between future and past pain and suffering. Plaintiff suggests that we split the award of general damages in half, attributing $50,000.00 to past pain and suffering and $50,000.00 to future pain and suffering. We note that the awards for lost earnings to the date of trial and lost future earning capacity are each within several thousand dollars of $50,000.00. Therefore, it is reasonable to split the $100,000.00 award of general damages in half for purposes of assessing pre-judgment interest for that portion attributable to past pain and suffering.
We will amend the judgment of the trial court to split the award for general damages into $50,000.00 for past pain and suffering and $50,000.00 for future pain and suffering. The trial court awarded pre-judgment interest on all portions of the judgment. We will further amend the judgment of the trial court to eliminate the award of pre-judgment interest for the $50,000.00 awarded for future pain and suffering.
For the foregoing reasons, we amend the judgment of the trial court (1) to reduce the award of damages for future lost wages to $46,570.00; (2) to eliminate the award of prejudgment interest on the $46,570.00 award for future lost wages; (3) to apportion the total award of general damages, $100,000.00, into $50,000.00 for past pain and suffering and $50,000.00 for future pain and suffering; and (4) to eliminate the trial court's award of pre-judgment interest on the award of $50,000.00 in general damages for future pain and suffering. We affirm the judgment of the trial court as amended and in all other respects, including all awards of pre-judgment and post-judgment interest at the rates set by law, except those eliminated above.
AMENDED; AFFIRMED AS AMENDED.