563 So.2d 1194 (1990)
Charlene WHATLEY
v.
REGIONAL TRANSIT AUTHORITY.
No. 89-CA-1583.
Court of Appeal of Louisiana, Fourth Circuit.
May 31, 1990.
Rehearing Denied August 8, 1990.
*1195 Holoway, McQuaig, Solomon & Dyer, APLC, Michael E. Holoway, Jack E. Truitt, Metairie, for plaintiff-appellant.
*1196 Kiefer, Kiefer & Schneider, Nat G. Kiefer, Jr., New Orleans, for defendant-appellant.
Before KLEES, BYRNES and PLOTKIN, JJ.
BYRNES, Judge.
This is an action for damages arising out of a vehicular accident which occurred on August 11, 1986, at approximately 8:55 a.m., on Canal Street near the intersection of South Carrollton Avenue, in the City of New Orleans. The district court awarded the plaintiff, Charlene Whatley, damages of $220,500 against the Regional Transit Authority. Both parties appeal complaining that the trial court erred in its findings on liability and quantum. We affirm the judgment of the trial court.
The issues raised on appeal are: (1) Did the trial court err in its finding of fault? (2) Did the trial court err in refusing to grant a new trial? (3) Did the plaintiff prove the accident caused the plaintiff's condition of positional vertigo? (4) Was the general damage award excessive? (5) Did the trial court err in the amount of its award of special damages?

LIABILITY
In its reasons for judgment, the trial judge made the following finding regarding the issue of liability:
On 11 August 1986 at approximately 8:55 a.m., an accident occurred on Canal Street in the riverbound lanes near the intersection of South Carrollton Avenue in New Orleans. Canal Street at that point is a 6-lane street with 2 additional parking lanes; 3-lanes plus a parking lane are on either side of the median. The accident occurred in the third (from the median) and parking lanes when a car driven by the plaintiff, Charlene Whatley ("Whatley"), and a Regional Transit Authority ("RTA") bus were involved in a low speed crash of approximately 8 m.p.h. The left side of the RTA bus near the rear and the right front corner of the Whatley car met. No damage was sustained by the bus (or any damage that may have been sustained was so minimal as to be de minimus).
* * * * * *
Counsel for Whatley has presented to the Court a version of the facts of how the accident occurred. Counsel for the RTA has tried to establish that Whatley intended to make a right-hand turn onto South Carrollton Avenue to drop her son, age 2 at the time, (who was riding as a passenger in the car) at a nursery school located approximately two blocks away on South Carrollton. Fortifying this position is the fact that Whatley was in the right-hand lane of Canal Street. She testifies that she was heading to work at a location on Canal Street within approximately 8 blocks of the accident but on the odd-numbered side of the street; the accident happened on the even-numbered side of the street. Being such a short distance from work, the RTA's position is that Whatley more likely than not would/should have been in either the middle or left-hand lanes of Canal. That Whatley was in the right-hand lane would tend to reinforce their position that Whatley intended to make a right-hand turn.
Whether Whatley intended to turn right on South Carrollton or not is of no moment. Both Whatley and the RTA (acting through their bus driver) breached their legal duties to one another to drive carefully and safely as explained below in greater detail.
The Court does not find that the bus sped or "zoomed" into Whatley's lane forcing her into a collision. A multi-ton bus just doesn't move that fast although it sometimes seems that way. Reconciling the Whatley and RTA versions of the facts yields the following description of how the accident occurred.
The RTA was stopped near the corner in the parking lane loading and unloading passengers. The light was red. In the third lane, next to the parking lane, were 3 cars. Whatley was in the third car with the front passenger window of her car being directly opposite the bus's exhaust area on the left-hand side of the *1197 bus. After completing the loading/unloading process, while the light was still red, the bus driver pulled straight forward to the corner and stopped; he preempted the entire parking lane in order that no one could make a turn in front of him onto South Carrollton.
The light on Canal Street turned green. The bus very slowly pulled straight forward preempting part of the parking lane on South Carrollton. The two cars in front of Whatley proceeded forward and proceeded riverbound in the right-hand lane of Canal. Whatley delayed for a brief period of time before proceeding forward slowly. The RTA bus driver, apparently noting the speed of the Whatley vehicle, thought that Whatley was letting him preempt the third lane and accelerated thereby partially preempting a portion of the third lane. The bus driver had a duty to be sure that he could safely preempt the third lane. This he failed to do for he accelerated and pulled into the third lane without being certain that Whatley was yielding to him. As the bus began the maneuver, Whatley also began to accelerate. Not until it was too late to brake did Whatley observe that the bus was accelerating and was not yielding the third lane to her. She had a duty to maintain her vehicle under control as a following vehicle and to proceed with caution under the circumstances; she had a duty to anticipate a maneuver by the bus at some point that would bring the bus into the third traffic lane. She hit her brakes but not soon enough to avoid a collision with the bus. Because the bus was accelerating, a portion of its left side panel located approximately 4 feet from the rear end of the bus met the right front of the Whatley car. The point of impact between the vehicles was located on Canal Street in the parking lane approximately 20 feet from the corner of South Carrollton. (This location would appear to be too far from the corner to clearly establish that Whatley intended to turn right onto South Carrollton Avenue).
In this case, Whatley failed to exercise due diligence with respect to the situation. Her delay in pulling forward and/or the speed at which she pulled forward initially enticed the RTA bus driver to perceive that Whatley intended to wait for the bus to preempt entirely the third lane or intended to turn right on South Carrollton. The bus driver failed to exercise due diligence by attempting to preempt the third lane without carefully checking to see if all traffic in the third lane had actually yielded completely to him.
Based upon this set of facts, the court apportions negligence at 40% to Whatley and 60% to the RTA.
The defendant argues that the trial court erred in assessing it with 60% fault in causing this accident. The defendant reasons that the bus was clearly in its own traffic lane at the time of the accident; two cars positioned in front of the plaintiff's vehicle at the time of the accident precluded defendant's entry into her lane; and the evidence supported a finding that the plaintiff intended to make a right turn at the subject intersection, which thus explained plaintiff's entry into the defendant's lane of traffic.
The plaintiff argues that the trial court erred in assessing her with any liability as the defendant should have been held to an extremely high degree of care, and should have been in absolute control of its vehicle. Plaintiff further reasons that the failure of the bus to operate solely within its own traffic lane until it was safe to traverse the adjacent lane constitutes negligence per se. La.R.S. 32:79. Thus plaintiff concludes that the defendant should have been found 100% at fault in causing the accident.
A motorist is required to drive within a single lane when the roadway is divided into two or more clearly marked lanes of traffic and the motorist shall not move outside such lane until he has ascertained that such movement can be done safely. La.R.S. 32:79. Likewise, a motorist has a continuing duty to keep a sharp lookout ahead and to see what he should have seen. *1198 Garrett v. Celino, 489 So.2d 335, 338 (La. App. 4th Cir.1986).
In this case there was a conflict in the evidence as to how this accident occurred.
According to Ms. Whatley she was proceeding down Canal Street towards the river in the third traffic lane. She stopped for a red light at the intersection of Canal Street and Carrollton Avenue and there were two vehicles stopped ahead of her. She was adjacent to the defendant's bus at the time and her front passenger window was along side of the bus' exhaust vent. As the light turned green the two cars in front of the plaintiff moved forward. According to the plaintiff, as she began to move with the traffic, the bus "swerved" in front of her and its rear fender hit the right fender and bumper of her car. The plaintiff stated that she applied her brakes but was not successful in avoiding the impact. She further stated that after the accident the bus was in her lane of traffic.
A New Orleans Police Officer, Paul Mattio, who was assigned to the Transit Authority investigated the accident. Officer Mattio testified that at the time of the accident the bus was pulling away from the curb. The left rear of the bus struck the right fender of the car and both vehicles were proceeding at about 35 mph. According to the bus driver he was just pulling away from the bus stop, going straight ahead. The plaintiff stated to Officer Mattio that the bus came into her traffic lane. According to Officer Mattio, when he investigated the accident both vehicles were splitting the line. He was not aware of whether the vehicles had been moved before his arrival on the scene.
The driver of the RTA bus was Airl Jackson. He testified that on the date of the accident he was driving the Canal Street line headed inbound to the river. He had made a service stop at Canal and Carrollton and passengers had entered and exited the bus. As the light at the intersection changed Mr. Jackson drove straight into Carrollton Avenue about three feet. He felt an impact and looked into his mirror. He saw a car up against his bus. According to Mr. Jackson the plaintiff was attempting a right turn at the time of the accident. He stated that he at no time attempted to merge the bus into the plaintiff's traffic lane as there were two cars positioned in front of the plaintiff. According to Mr. Jackson's deposition the vehicles were not moved prior to the arrival of the investigating officer however, he refuted this fact at trial.
Mr. Charles Martin was a defense witness who admitted not seeing the accident happen. He was however present on the bus at the time of the accident. According to Mr. Martin the bus driver was proceeding in his own lane of travel at the time of the accident and he had not attempted to merge into the plaintiff's traffic lane. However Mr. Martin did state that he could not recall if the bus had crossed lanes at the time of impact.
Faced with a conflict in the testimony, the trial court reached a conclusion that the accident was caused by the defendant's preemption of the plaintiff's lane of traffic and the plaintiff's failure to control her vehicle after enticing the defendant to perceive that she intended for him to entirely preempt her traffic lane. These conclusions and the reasonable inferences drawn therefrom are fully supported by the record and we find no error in this regard. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978), on remand 370 So.2d 1262 (La. App. 3rd Cir.1979), writ denied 374 So.2d 660 (La.1979). Likewise, based upon these findings an assessment of 60% fault against the defendant and 40% fault against the plaintiff is likewise not clearly wrong and hence will not be disturbed on appeal. Arceneaux v. Dominque, supra.

NEW TRIAL
The defendant alleges that the judgment is clearly contrary to the law and evidence and since the trial judge acknowledged this fact on the hearing of the motion for a new trial, he erred in refusing to grant the new trial.
Louisiana Code of Civil Procedure, Article 1972 provided the grounds for a new trial: *1199 C.C.P. Art. 1972 Peremptory grounds
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.

* * * * * *
A review of the transcript of the hearing on the motion for a new trial indicates that the trial judge was concerned about the close issue of liability. The closeness of the issue is evidenced by the percentages of assessed fault. It is clear the judge's statement was merely an attempt to encourage the parties to the litigation to settle their differences, rather than risk possible reversal on appeal.
As previously discussed the judgment rendered is supported by the law and the evidence and for this reason the trial judge correctly denied the defendant's motion for a new trial. This assignment lacks merit.

CAUSATION
The defendant contends that the trial court erred in holding that the plaintiff's condition of benign positional vertigo was caused by this vehicular accident. Defendant reasons that the plaintiff suffered from vertigo and dizziness prior to the accident.
The trial court made the following findings with regard to the plaintiff's physical condition.
The Whatley vehicle sustained limited damage and Whatley struck her head on her hand which was wrapped around the steering wheel.
As a result of the accident Whatley sustained injuries consisting of vertigo with episodes of nystagmus. With medication, the condition has resolved itself into positional vertigo. [The nystagmus is significantly improved if not non existent]. Whatley still experiences irregular yet not infrequent episodes of vertigo or dizziness.
The court does not belittle or take lightly Whatley's problems with vertigo. Vertigo can be very disabling and once developed may never be cured. Whatley has experienced from time to time since 11 August 1986 nausea, fullness in the ears, ringing in the ears, nystagmus, dizziness, headache, anxiety, depression and memory loss. All of these experiences are directly related to the trauma to her head sustained on 11 August 1986. The multiple medications that Whatley has tried alleviated some of the symptoms (although the October 1988 Causeway accident has caused some symptoms to be aggravated). An operation relieved the fullness in her ears.
* * * * * *
The plaintiff bears the burden of proving by a preponderance of the evidence that it is more probable than not that the injuries of which she complains were caused by the accident. Walker v. Marcev, 427 So.2d 678 (La.App. 4th Cir.1983) writ den. 433 So.2d 182 (La.1983).
In this case the lay and expert testimony support the trial court's finding that the accident of August 11, 1986 caused the plaintiff's condition of positional vertigo.
When questioned concerning a notation in her medical records regarding episodes of dizziness which predated the accident the plaintiff explained that the condition she experienced before and after the accident were distinctly different. Although she referred to her prior condition as "vertigo" she explained that it was a dizziness. Her later condition of "postional vertigo" gave her a feeling of imbalance. She described it as a feeling of "spinning" or "rotating" in which she cannot control her head and she rocks.
Dr. Leon Weisberg, the Chairman of the Department of Neurology at Tulane Medical Center and the plaintiff's treating physician testified that there exists a distinction between dizziness and vertigo. There are different categories of dizziness, one is light-headedness and one is vertigo. The plaintiff's condition after the accident involved an impairment of the balance of a stipular mechanism. It was a situation in which the patients reported either that they are spinning or the environment is spinning. Dr. Weisberg was of the opinion *1200 that the trauma of the accident caused the plaintiff's condition of benign positional vertigo.
Dr. David Drachman, a renowned neurologist with a sub-specialty in vertigo-type disorders supported Dr. Weisberg's position that it was more probable than not that the plaintiff's benign positional vertigo was related to this automobile accident.
This position concerning causation is also collaborated by the testimony of Dr. Michael Glasscock, III, a specialist in otology and neurotology.
Therefore the trial court correctly found that the plaintiff's condition of benign positional vertigo was more probably than not caused by the accident of August 11, 1986 and that finding is fully supported by the record. We find no error in that regard.

QUANTUM

GENERAL DAMAGES
The trial judge awarded the plaintiff damages as follows:

General Damages $150,000
Lost Wages 50,750
Medical Expenses 19,750
(Past & Future) ________
 $220,500 TOTAL

The defendant contends that the trial court's award of $150,000 general damages was excessive and an abuse of discretion. He alleges that no evidence was presented to establish that the plaintiff's vertigo condition is permanent and disabling.
The trial court made the following findings with regard to its award of general damages:
General damages are in this Court's opinion $150,000.00. In assessing general damages this court was impressed with the following. Prior to the accident, Whatley was a workaholic. This is probably due in part to her having suffered as a child from spinabifida, a birth defect. Whatley's reaction to the work is to show it that she is "superwoman". In this sense the psychological damage of being unable to do everything she once could is most frustrating. She continues to suffer from regular episodes of positional vertigo which slows and diminishes her ability to perform at maximum former levels. Medication helps control both the quantum and severity of the episodes of vertigo. To have to remain on multiple medications, probably in perpetuity, to control the disability is indeed further damaging to her psyche. This court finds vertigo a serious illness for which significant damages lie and for which a cure is uncertain and probably unlikely. If she suffered from vertigo constantly, damages could theoretically approach a seven figure number. However, Whatley's vertigo occurs only when she adjusts her head in certain positions, but exactly which positions produce the dizziness are not consistent. The uncertainty and current frequency justify a lesser award.
In assessing damages in cases of quasi-offense much discretion is left to the trial judge. Perniciaro v. Brinch, 384 So.2d 392, 395 (La.1980). Before the appellate court will disturb such an award, the record must clearly reveal that the trier of fact abused his discretion in making the award based upon the particular injuries and their effect upon the particular individual who sustained the injuries. Perniciaro v. Brinch, supra, at 395; Reck v. Stevens, 373 So.2d 498 (La.1979).
The record reveals the following evidence regarding the plaintiff's injuries and their effect upon her:
The plaintiff Charlene Whatley, at the time of this accident was a 27 year old licensed practical nurse who had 15 years of education. She was also a wife and mother of a two year old son. She was employed since 1985 by Dr. William Benjamin Smith, as a "girl friday" and she performed clinical investigations for drug companies. Her employer described Ms. Whatley as "meticulous", "ambitious", "bright", and possessed of "good common sense". According to Dr. Smith before the accident the plaintiff performed her work admirably. Following the accident she was erratic, unpredictable and her work was unacceptable.
*1201 The plaintiff's sister, Judy Holoway, stated that Ms. Whatley had been a workacholic before the accident and suffered from depression since the accident because she could not function as a nurse. Ms. Holoway also said that prior to the accident her sister was a speed reader but since the accident her span of concentration had been limited.
At the time of the accident the plaintiff's head struck her hand which was positioned on the automobile steering wheel. The impact affected her memory such that she could remember only portions of the incidents that occurred on the day of the accident. Ms. Whatley was initially treated in the emergency room of Tulane Medical Center. She was sleepy, dizzy, faint and suffering severe headaches. She also experienced a spinning effect. She was admitted to the hospital where she remained for three weeks. She was diagnosed as having post-concussion syndrome. Thereafter she remained at home for two weeks.
On October 16, 1986 the plaintiff was seen by Dr. Leon Weisberg, Chairman of the Department of Neurology at Tulane Medical Center. She was suffering from headaches which were associated with dizziness which she described as vertigo (i.e., an hallucination of movement). The plaintiff reported this condition to be worse when she was lying down and improved when she was standing, however certain positions would activate it. The plaintiff was found to have vertigo and nystagmus (i.e., jerky eye movement). She was treated with Dialaudid for her headache and Vistaril for nausea. She was referred to Dr. Hollis Reed, an otolaryngologist. On December 11, 1986 the plaintiff was seen by Dr. Reed. She complained of dizziness associated with her auto accident of August 11th. Dr. Reed concluded that the plaintiff's dizziness was a vertigo mechanism.
The plaintiff again visited Dr. Weisberg in February, 1987 and she reported persistent vertigo, ringing in her ears and balance problems associated with the vertigo. She associated these complaints with the automobile accident. She was given Antivert, which dampens the aptitude of electric firings from the vestibular mechanism. She was also given Retalin for a central nerve stimulant for her vertigo. She was seen by Dr. Wall, a neuro-opthalmologist who found no other abnormalities.
In March, 1987 Dr. Donald Adams, another neurologist, saw the plaintiff. She continued to suffer from dizziness of a vertiginous type. At this time the plaintiff's major complaint had been that of memory loss. She was given neuropsy chological test and MMPI. Dr. Adams diagnosed plaintiff as suffering from sommatization and he prescribed Desyrel for depression.
At this time Dr. Weisberg, plaintiff's treating physician disagreed with Dr. Adams' diagnosis because of the plaintiff's positional vertigo. He recommended that she be examined by Dr. Drachman an out of state expert in vertigo. Dr. Weisberg recommended that Ms. Whatley not continue work because her vertigo made her feel off balance. She was still experiencing symptoms of spinning, vertigo, ringing in the ears and nystagmus.
On May 1, 1987 Dr. Weisberg treated the plaintiff for continued dizziness. Dr. Weisberg added Tranxene as a medication for plaintiff's condition of vertigo.
On May 27, 1987 the plaintiff had an exacerbation of dizziness and her vertigo was more severe. She was treated with Antivert and Hydroduril. Dr. Weisberg was of the opinion that the plaintiff's condition of vertigo was caused by the automobile accident in which plaintiff was involved. He agreed with Dr. David Drachman who had diagnosed the plaintiff as suffering from positional vertigo. This condition made the plaintiff have a spinning sensation which caused her to be imbalanced and to fall. For this reason Dr. Weisberg was of the opinion the plaintiff was unable to work. At the time of this visit the plaintiff was upset because her condition had not improved. Her memory remained disturbed and she had difficulty with concentration.
The plaintiff next visited Dr. Weisberg in September 1988. Her symptoms were controlled *1202 by Ritalein, Serax and Antivert. They discussed decreasing the amount of medication in six weeks. They also discussed plaintiff's possible return to work in a less stressful environment, such as an outpatient clinic.
In October 1988 the plaintiff continued to experience dizziness. On October 12, 1988 the plaintiff's medicine was stopped and this worsened her condition of dizziness. She had been involved in an accident on the Causeway on October 21st and was rendered unconscious and later experienced pain behind her right ear. She was feeling suicidal and was referred to a psychiatrist.
On November 11, 1988 the plaintiff again visited Dr. Weisberg. She continued to complain of vertigo. The vertigo had returned to such a degree of severity as to constitute an interference with her ability to return to work. Dr. Weisberg was of the opinion that the plaintiff could possibly return to work if after a resumption of her medications, her condition returned to the state it was as of September, 1988.
Dr. Michael Glasscock, III is a specialist in Otology and Neurotology who first saw the plaintiff on December 27, 1987. He placed Ms. Whatley on Valium and Rubinul in attempt to control her vertigo. On April 19, 1988 Dr. Glasscock performed exploratory surgery on the plaintiff in search of a fistula but none was found. Thus this condition was ruled out as a cause for plaintiff's feelings of fullness in the inner ear, ringing in the ear and episodic vertigo. According to Dr. Glasscock there exists a 20% chance these medications will not control plaintiff's condition. If the condition was not controlled the plaintiff would, in Dr. Glasscock's opinion, not be able to carry on gainful employment. He also stated that if the plaintiff suffered an attack of vertigo it would impair her ability to function as a licensed practical nurse because it would prevent her from getting into certain positions.
Dr. Paul Blair, an Otolaryngologist, examined the plaintiff in the later part of 1986. He was of the opinion that the plaintiff's vertigo and tinnitus had impacted upon her psychologically and physically with the effect that it had "deteriorated her quality of life, her lifestyle and her work lifestyle."
Dr. Hollis Reed, an Otolaryngologist examined the plaintiff on December 11, 1986. When presented with the plaintiff's complaint of dizziness changing with her head position, Dr. Reed stated that this factor would lead him to conclude that she was suffering from benign paroxysmal positional vertigo. He was of the opinion that such a condition may not completely resolve itself, yet some people learn to accept it and work through it. Dr. Reed also stated that within a reasonable amount of time following the accident this condition should improve and thus, the longer the patient goes without a return to their normal state the more probable it is that they will not completely recover.
At the time of trial the plaintiff testified that she was still suffering from daily incidents of vertigo. She had been prevented from maintaining her exacting job as a clinical researcher. She has also experienced occasions of such imbalance that she would fall and on at least one occassion had injured herself physically in a fall. Contrary to the defendant's assertions it is clear from the record that the plaintiff's condition of vertigo is both permanent and disabling and the court accepted it as such. Therefore, considering the plaintiff's condition and its negative effect (both physically and psychologically), upon the plaintiff's personal and professional life, we cannot say that the trial judge's award of $150,000 in general damages was an abuse of discretion.

SPECIAL DAMAGES

(1) MEDICAL EXPENSES
The trial court awarded the sum $19,750.00 for past and future medical expenses. The defendant contends that this was an abuse of discretion in that plaintiff only proved past expenses of $950.
A review of the record indicates that with regard to past medical expenses the plaintiff introduced a summary of medical bills with a number of actual medical bills. *1203 At the time of this introduction defendant made the following comment:

BY MR. KEIFER:
"I have not stipulated that those bills were recoverable but these bills that were incurred by these physicians."
Under these circumstances we conclude that a fair reading of the record indicates that the parties agreed that the summary of expenses was sufficient evidence of the past medical expenses incurred by the plaintiff with the enumerated medical providers. The issue in dispute at the time, which was later resolved in plaintiff's favor, was the causal connection between these expenses and the accident of August 11, 1986.
To the extent that the trial court award of past medical expenses reflects a sum in excess of $950 we find no abuse of discretion.
Defendant next argues that the award of future medical expenses is an abuse of discretion because the plaintiff failed to prove this item of damages.
In order to recover for future medical expenses, a plaintiff must prove that it is more probable than not that such expenses will be undertaken and incurred. Morris v. Highlands Insurance Co., 525 So.2d 125 (La.App. 3rd Cir.1988).
As previously discussed, Ms. Whatley established that her condition of vertigo is of a permanent nature. In this regard, it was also established that the condition is controlled by the continued use of various medication (which include Ritalin, Serax and Antivert). Additionally, at least two physicians (i.e., Dr. Blair and Dr. Glasscock) testified that plaintiff may require intracranial surgery in the future to alleviate the vertigo symptoms. Dr. Glasscock estimated that the future cost of the procedure and hospitalization would be $9,000 to 10,000.
Under these circumstances we find an award of $19,705 for past and future medical expenses was not an abuse of the trial court judge's discretion.

(2) LOST WAGES
The defendant alleges that the trial court erred in awarding $50,750 for lost wages.
In order to recover past and future lost wages the plaintiff must prove these items of damages with reasonable certainty. Naman v. Schmidt, 541 So.2d 265 (La.App. 4th Cir.1989). These calculations, however, need not be made with mathematical certainty. Garrett v. Celino, 489 So.2d 335 (La.App. 4th Cir.1986).
The trial court made the following findings in awarding lost wages to the plaintiff:
From the date of the accident through early March 1987, Whatley was paid by her employer Dr. William Smith. Thereafter she sustained lost wages which the court calculates to be roughly $29,000.00 per annum. As of September 1988 Whatley was able to return to substantially similar work provided the work was less stressful than her former work. Cycling in the actual lost wages plus a reasonable period of time to find a suitable job, the Court finds the lost wages to be $50,750.00.
These findings are fully supported by the record. Additionally, an expert economist, Dr. Kenneth Boudreaux, was presented at trial. He testified concerning the plaintiff's past lost wages. He estimated that as of the trial date, plaintiff had lost wages of $66,188.57. He based his calculation on the fact that plaintiff's base wage at the time of the accident was $28,982.00 and she would, according to her former employer, be earning $40,000 if she were working at the time of trial. As such the plaintiff's past lost wages were established with a reasonable certainty and the trial court did not err in awarding the sum of $50,750.00.
Finally, plaintiff argues that the trial court erred in refusing to award a sum for future lost wages and for plaintiff's medical condition occuring after October 1, 1988.
In denying recovery after this date the court reasoned as follows:
(This court has treated the deadlines set forth in its pretrial order as absolute *1204 cutoff dates. This Court denied plaintiff the ability to call witnesses relating to treatment received by her after the cutoff dates because, pursuant to Local Rule 10, Section 4, the filing of the motion to set for trial on the merits is a certification by counsel that all issues are joined and all that's left to be done is try the case. But for court delay and heavy dockets, the trial could be had in very short order. The Court has expressed the foregoing as a preface to its calculation for damages. [Subsequent to the cutoff date, Whatley was involved in an accident on the Lake Pontchatrain Causeway; that accident may have aggravated her prior existing condition.])
Local Rule 10 Section 4, of the Rules of Court for Civil District Court provides:
RULE 10. ASSIGNING CASES FOR TRIAL
Section 4. No case shall be placed upon any docket for trial, except by order of the court, granted upon motion by a party, suggesting to the Court that all issues propounded in the principal and incidental demands have been joined; that cases which should be consolidated in accordance with local Rule 8, Section 10, have been consolidated; that all exceptions have been disposed of; motions for summary judgment heard; all discovery completed; and that the case is ready for trial on its merits. Said motion shall be signed by the attorney for the mover, who shall certify that trial counsel for all parties have conferred, in person, to confirm the foregoing have been accomplished.
Except in cases where it is manifest that there has been an abuse of discretion, the exercise, by a trial court, of its discretion with respect to the construction, interpretation, application or enforcement of its own rules, will not be disturbed on appeal. Precision Motors, Inc. v. Beder, 273 So.2d 650 (La.App. 4th Cir.1972).
In this case the trial judge correctly precluded the plaintiff from presenting evidence of events occuring after October 1, 1988 in that the parties' request to place this matter on the trial docket constituted a certification that all issues were joined and the matter was ready for trial on the merits. The trial judge's actions constitute a reasonable interpretation of that court's rules and we find no abuse of his discretion in this regard.
For the reasons assigned, the judgment of the trial court is affirmed. Each party shall bear his own costs.
AFFIRMED