612 So.2d 201 (1992)
Donna B. AUSTIN
v.
Joseph A. PASCARELLI, Popeye's Fried Chicken of Louisiana, Inc., et al.
No. 90-CA-2233.
Court of Appeal of Louisiana, Fourth Circuit.
December 29, 1992.
Writ Denied March 26, 1993.
*202 Richard A. Tonry, Law Office of Tonry & Ginart, Chalmette, for plaintiff-appellee.
James W. Hailey Jr., William Ken Hawkins, Hailey, McNamara, Hall, Larmann & Papale, Metairie, William G. Cherbonnier Jr., Dwight Doskey, Harvey, for defendants-appellants.
Before LOBRANO, WARD and ARMSTRONG, JJ.
ARMSTRONG, Judge.
Plaintiff, Donna B. Austin, instituted this personal injury action against defendants, Al Copeland Enterprises, Inc. ("Copeland"),[1] Joseph Pascarelli, a Copeland employee, *203 Ideal Mutual Insurance Company, Copeland's insolvent insurer, and Louisiana Insurance Guaranty Association ("LIGA"), seeking damages for injuries she sustained when her vehicle was rear-ended by a company leased vehicle driven by Pascarelli. Following a jury trial, judgment was rendered in favor of plaintiff and against defendants in the amount of $513,000.00. Defendants now appeal.[2]
On May 4, 1983, at approximately 12:00 a.m., defendant, Joseph Pascarelli, at that time an area supervisor for Copeland, rear-ended a vehicle being driven by plaintiff. Pascarelli had just left a Popeye's Fried Chicken outlet on St. Claude Avenue and was enroute to his home in Chalmette. As he passed by another Popeye's Fried Chicken outlet in his territory on Judge Perez Drive in Chalmette, Pascarelli was distracted when he noticed one of the Popeye's employees sitting on the counter talking on the telephone. Plaintiff, driving with a passenger directly in front of Pascarelli, slowed and came to a stop when a vehicle in front of her made a right hand turn. Pascarelli turned his attention back to the road and attempted to veer into the left hand lane to avoid striking plaintiff, but impacted the left rear portion of plaintiff's pickup truck. Pascarelli estimated he had been travelling at 30-35 miles per hour immediately before the accident, and 20-25 miles per hour upon impact. Plaintiff sustained injuries to her neck and left shoulder as a result of the accident.
On appeal, defendant raises five assignments of error. Defendant claims the trial court erred in refusing to continue the trial at the request of defense counsel; in allowing some of plaintiff's medical bills into evidence without a proper foundation; and in not granting defendant's motion for new trial or, in the alternative, a remittitur. Defendant also claims the jury erred in finding a causal connection between plaintiff's post-October 28, 1983 medical problems and the accident in question; and abused its discretion in awarding damages.

CONTINUANCE
On the morning of trial, counsel for defendant Copeland, who was also representing defendant Pascarelli, moved for a continuance on the ground that a conflict of interest existed in his representation of Copeland and its employee, Pascarelli, against whom Copeland, through another attorney, had filed a cross-claim for indemnity. The attorney who filed the cross-claim against Pascarelli on behalf of Copeland withdrew from the case several months before trial. After hearing argument on the day of trial, the trial judge denied the request for a continuance but severed Copeland's cross-claim against Pascarelli.
La.C.C.P. art. 1601 provides that a trial court may grant a continuance in any case if there is good ground therefor. A trial court's ruling on a motion for continuance will not be disturbed on appeal absent a clear abuse of discretion. Sauce v. Bussell, 298 So.2d 832 (La.1974).
Copeland and/or LIGA had several months to secure additional counsel to represent themselves or Pascarelli. The trial court apparently balanced prejudicing plaintiff, who was ready for trial on the date set, and defendants, who had ample time to secure additional counsel but failed to do so. Considering these circumstances, we are unable to say that the trial court abused its discretion in severing trial of the cross-claim and denying the request for continuance.

CAUSATION
Plaintiff next claims the trial court erred in finding a causal connection between any *204 of plaintiff's medical problems after October 28, 1983 and the May 4, 1983 accident. On the night of the accident plaintiff was examined by a chiropractor with whom she was acquainted, Dr. Larry Bryant.[3] The night of the accident was the first time Dr. Bryant had ever treated plaintiff. She gave a history of having just been involved in a rear end collision. She said she was feeling pain in her left shoulder and her neck was stiff. She also said her chest was tender, and that she was having headaches. A physical exam revealed muscle spasm in her neck and shoulder area, and the area was tender to palpation. He also found moderate restrictions in cervical spine extension, lateral flexion, and rotation.
Dr. Bryant's initial diagnosis was traumatic cervical sprain and strain with "intervertebral disc syndrome." Dr. Bryant said he wasn't sure whether there was a herniation or rupture, or just a compression of the cervical disc. It was his impression that something was wrong with plaintiff's disc. He treated her conservatively, but in mid-July, recommended that she see an orthopedist. Dr. Bryant last treated plaintiff on September 7, 1983. He said as of that time he still believed she had either a herniation, rupture or compression of a cervical disc. He estimated plaintiff improved "maybe" 10% over the period he treated her.
Dr. James R. Gosey Jr., an orthopedist, treated plaintiff from May 10, 1983, some six days after the accident, to October 28, 1983. She gave a history of being involved in the recent automobile accident and being treated by a chiropractor. On examination, Dr. Gosey found tenderness in the neck, with a decreased range of motion and pain at the extremes. A compression test revealed pain on the right side. He did not find any nerve problems in her arms. His provisional diagnosis was cervical strain. At a visit on May 17, 1983, plaintiff still complained of significant problems with her neck. She still had significant spasm and tenderness on the right side of her neck and the range of motion was still two-thirds normal.
Dr. Gosey saw plaintiff four more times; the last visit was on October 28, 1983. He said she improved over that period but began to complain of left shoulder pain which he attributed to bursitis or tendonitis. He injected the shoulder with cortisone and it seemed to help. On the last visit, plaintiff was still complaining of headaches, "occasional" stiffness in the back of her neck, and mild tenderness in the left shoulder. He said he again advised her to see a neurologist about the headaches.
Dr. Gosey never performed a CAT scan, MRI, discogram, myelogram, or thermogram. He admitted that plaintiff's initial pain and spasm in her neck was consistent with either a sprain or a disc injury. He said as of the last few visits, the neck pain was "essentially" resolved and there were no findings to suggest a disc injury as of the time of discharge on October 28, 1983. He admitted that it was possible, and very common, for someone to have a bulge in the disc and yet not have pain or be symptomatic because of the bulge. Dr. Gosey also admitted that plaintiff complained of stiffness in her neck throughout the entire course of treatment.
Dr. Stuart Philips, an orthopedist, first examined plaintiff in late September 1983. On examination he found a limited range of motion in plaintiff's neck and muscle spasm in the back of her neck. He said x-rays of the neck were normal. His initial diagnosis was an injury to the ligaments holding the cervical disc, a strain, with a bruised back and chest. He felt she had been treated appropriately with conservative care. Dr. Philips said he thought it would take three to five months before he knew what was wrong with her. He said that if she did not get well, eventually, he would do some tests. He felt conservative treatment for approximately a year was reasonable.
Dr. Philips did not see plaintiff again until March 4, 1985. At that time she was still complaining of neck and shoulder pain *205 and pain in her left arm. She informed him that she had been treated by Dr. Gosey. She was still following his prescribed course of conservative treatment, using a home traction device and taking medication prescribed by him. A CAT scan ordered by him and done April 22, 1985 revealed a small spinal canal with no other abnormality. However, he said this finding made him suspect a probable disc injury. A thermogram done that same day showed nerve irritation in plaintiff's arm. A subsequent discogram showed a tear in the ligament and the disc at the C4-C5 level of plaintiff's cervical spine.
Following the discogram, Dr. Philips continued to treat plaintiff conservatively. However, in October 1985, she returned to him complaining of what he described as acute and severe pain. Dr. Philip removed the disc on October 28, 1985 and performed a fusion which ultimately did not take. In November 1985, after the surgery and fusion, plaintiff reported that her neck was okay and she had no complaints of arm or head pain. In December 1985 she complained of shoulder pain but Dr. Philips thought it was bursitis. In January 1986 she reported some neck pain. As of April 1986 she had gone back to work as a cosmetologist, and was only taking a tranquilizer for medication. As of that time, Dr. Philips estimated plaintiff as having a 20% loss of function in her cervical spine.
In July 1986 plaintiff reported a recurrence of neck pain and headaches, and complained of numbness in her fingers. Dr. Philips stated that a CAT scan taken around that time showed that the fusion had not taken. He said it looked like scar tissue, fibrous tissue, had grown in the joint. He said this type of recovery after a fusion tends to be a pain generator. Dr. Philips last saw plaintiff in November 1986 because she moved to Florida.
Dr. Philips testified that it was not unusual for a person to be diagnosed with a cervical strain or sprain, be treated conservatively, have the pain continue, and then later be diagnosed with a definite disc injury. He said it was not uncommon for a patient to have an interruption in treatment. Dr. Philips stated that based on the history given by plaintiff, the most reasonable cause of her disc problems was the May 4, 1983 accident. He said he never thought plaintiff was a malingerer. He felt her problems were real. She had objective manifestations of injury in the muscle spasm and positive results on the thermogram and discogram. Dr. Philips said he observed the ruptured disc when he performed the surgery on plaintiff in October 1985. He also stated that he knew plaintiff had been admitted to a hospital in Slidell, Louisiana for treatment of depression in the summer of 1986.
Dr. Michael Haydell, a chiropractor, examined plaintiff in May 1985. His examination revealed a decrease in the normal range of motion of the cervical spine on extension and flexion. He found no lateral flexion or rotation to the left at all. On palpation he found sensitive areas at the C1-C6 levels of plaintiff's cervical spine. He found spasm in her trapezius muscle. He said a compression test revealed evidence of encroachment on a nerve in her cervical spine. Dr. Haydell also found a marked decrease in the normal curve of the cervical spine. He treated plaintiff everyday from May 4-10, 1985. He said she complained the entire period about pain and discomfort in her cervical spine, headaches, and pain in her left arm and shoulder.
Three video depositions taken of Dr. Leo M. Flynn were played for the jury. Dr. Flynn was an orthopedist who treated plaintiff after she moved to Florida in 1986. He first saw plaintiff in October 1986. Her complaints were burning in her neck, pain radiating down the back of her neck in between her shoulder blades, and general numbness involving both shoulders. She also complained of low back pain and pain in her left leg, with numbness in her left foot. An examination revealed tenderness in the back of her neck and muscle spasm in both shoulders. Dr. Flynn found restriction of motion in flexion, extension and rotation of plaintiff's neck and lower back. He found a positive straight leg raise test for the left leg, indicating something was irritating her hamstring or sciatic nerve. He said plaintiff's complaints on her first *206 visit to him were consistent with his findings on examination.
Dr. Flynn's initial diagnosis was a "disctype" injury in her neck along with residual scar tissue from the fusion. He also diagnosed a muscle-ligament problem in her lower back with possible disc deterioration. He recommended physical therapy and encouraged her to wear a cervical collar. He also prescribed several kinds of medication to reduce pain and muscle spasm in her neck and back. A subsequent bone scan suggested some arthritic changes in the sternum area which could have been related to the accident. Although a CT scan of the lumbar spine showed bulging of the disc at the L3-L4 and L4-L5 levels, a discogram indicated the pain in her legs was not caused by these bulges. But, he said, a bulge at L5-S1 could be causing these problems. Based on the history provided by plaintiff, Dr. Flynn felt that the accident was the origin of all of her problems.
Dr. Flynn testified that one commonly sees persons with cervical disc problems at the C4-C5 level, like plaintiff, try to compensate for the limited range of movement and subsequently develop lower back problems. He said there was nothing in plaintiff's employment history to suggest that she would have injured her lower back working, but admitted that repeated "insults" to the back could lead to deterioration of discs. Dr. Flynn stated that it was very common for individuals with severe back and neck problems to experience a great deal of depression and frustration in dealing with those injuries.
Dr. Flynn continued to treat plaintiff conservatively, prescribing a TENS unit to reduce pain through electrical stimulus. He also said she told him she was using a whirlpool regularly and wearing a cervical collar at home. He encouraged her to continue physical therapy and work to improve mobility and increase her strength. As of August 1988, Dr. Flynn stated, he noted bulging discs at the C2-C3 and C3-C4 levels of plaintiff's cervical spine, directly above the C4-C5 level where a disc had been removed by Dr. Philips. He said these bulging discs were related to the disc problem and removal at the C4-C5 level. He believed the discs at the C2-C3 and C3-C4 levels were strained since C4-C5 was no longer functioning as a normal shock. Finally, Dr. Flynn stated that there was a good chance that plaintiff will need future surgery to have the discs removed and fusions performed at the C2-C3 and C3-C4 levels and that a re-fusion would have to be performed at the C4-C5 level.
Plaintiff testified that she never had any problems with her neck before the May 4, 1983 accident. In the accident she said she was thrown forward into the steering wheel, and then thrown backward. After, the accident in which she was rear-ended, as she and her friend were driving away from the scene, she said she felt pain in her left shoulder and felt like she had pulled some muscles in neck. She said the next day she was "real sore" in her left shoulder, and in the neck and chest. She stopped seeing Dr. Gosey, the first orthopedist she saw after the accident, because of the expense. However, she also stated it was because Dr. Gosey kept telling her she would get better and she did not. The pain affected her ability to work and she has been in continuous pain since the accident, some days worse than others. The only time she has really been effectively pain free was for a couple of months after the surgery and fusion. Plaintiff says she uses a cervical collar, used a TENS unit before it broke, gets massages, and uses a whirlpool to help her deal with her pain and discomfort. Plaintiff's husband and two of her children testified concerning plaintiff's being in obvious pain and discomfort since the accident.
Defendant points to a May 1984 "altercation" between plaintiff and her brother as a source of her post-October 1983 physical problems. Dr. Gosey last treated plaintiff on October 28, 1983 and he felt her problems had essentially been resolved. In May 1984 plaintiff went to her father's home to chastise her adult brother, Marion Bennett, who was temporarily living with their father. She and Marion got into an argument. Marion grabbed plaintiff and pushed her to the ground where she attempted to bite him on his legs. Marion *207 kept pushing her down and away from him so she wouldn't be able to bite him. The police were called, and ultimately plaintiff filed a criminal complaint with a justice of the peace. Marion was charged and tried for simple battery. He was found not guilty.
At her brother's trial, plaintiff testified that he hit her in the back of her head ten times and that she couldn't move her head for three days. However, she did not go to the hospital for treatment of any type of injury. Her brother, Marion, testified that he struck plaintiff on the back of the head when she was biting him. At trial in the instant case, plaintiff testified that she couldn't move her head for three days after the incident with her brother. However, she said this was due to terrible headaches she got because of the emotional stress she experienced over the incident. She said she had no bruises, cuts, abrasions or marks of any kind as a result of the altercation. She said before the incident her neck was hurting her, and after it was hurting her. She experienced no exacerbation of her symptoms because of the fight.
Her husband and two of her children testified that they observed no bruises, abrasions, etc. on plaintiff after the incident with her brother. Plaintiff's husband said she was complaining of a headache when she came home from her father's because she was so upset over the incident. Plaintiff's 9th grade son Michael testified that plaintiff was crying and had a headache after the incident with her brother.
The jury heard this evidence and determined that it was more probable than not that the cause of plaintiff's medical problems was the May 4, 1983 accident. This is a factual determination which, on appellate review, may not be disturbed absent sufficient evidence to support it, and/or it is clearly wrong. Canter v. Koehring Co., 283 So.2d 716 (La.1973). In Rosell v. ESCO, 549 So.2d 840 (La.1989), the Louisiana Supreme Court commented on the clearly erroneous standard as applied to factual findings based largely on the credibility of fact witnesses. The court stated:
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. (Citations omitted.)
In the instant case, the factual finding by the jury rested largely on the testimony of plaintiff's treating physicians and her own testimony. The evidence clearly furnishes no significant evidence that plaintiff had any type of pre-existing disc problems. While it was Dr. Gosey's opinion that plaintiff's problems had been essentially resolved as of October 1983, Dr. Philips and Dr. Flynn felt otherwise. There was no conclusive evidence that plaintiff suffered an additional injury to her neck in the altercation with her brother. The delay in her being treated from October 1983 to March 1985 does not conclusively prove that her problems after October 1983 were not related to the May 1983 accident. What appears certain from the record evidence is that after the accident plaintiff experienced problems she did not have before the accident.
We are unable to say there was not sufficient evidence from which a jury could have found that plaintiff's medical problems were caused by the May 1983 accident. *208 Further, we are unable to say that such a finding was clearly wrong.

MEDICAL BILLS
Defendant next claims that the trial court erred in allowing into evidence numerous medical bills, exhibits labeled Austin # 14, 16, 19, 20, 21, and 22, without a proper foundation being laid as to the accuracy or relevancy of the bills, and argues that the award for past medical expenses, $25,000.00, be reduced by the amount of these bills.
These types of medical bills are considered to be hearsay evidence and to be admissible they must fall under one of the exceptions to the general rule that hearsay evidence is inadmissible. La.C.E. art. 802 states: "Hearsay is not admissible except as otherwise provided by this Code or other legislation." See also, La.C.E. art. 801. The hearsay exception applicable to the evidence objected to is La.C.E. art. 803(6) which provides an exception, in a civil case, for:
[A] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
La.C.E. art. 803(6) covers what is characterized as "Records of regularly conducted business activity," and includes "professions" and "occupations" "of every kind." Admissibility under this exception to hearsay rule requires testimony by the custodian of the records "or other qualified witness." This was not done in the instant case with regard to the medical bills noted by defendant.
Plaintiff cites Guillory v. Shelter Mutual Insurance Company, 542 So.2d 850 (La. App. 3rd Cir.1989), where the court held that medical bills were properly allowed in evidence after plaintiff testified to the events surrounding her accident and injuries, including treatment for those injuries, and identified her medical bills by date, amount, and physician or hospital, and her treating physicians testified to their treatment of the plaintiff. The Louisiana Code of Evidence was not in effect at the time of trial in the Guillory case. Therefore, the Code was not considered by the appellate court ruling on the trial court action. The reasoning in Guillory conflicts somewhat with La.C.E. art. 802's rule against admitting hearsay evidence; the procedure used in admitting the evidence does not fall under La.C.E. art. 803(6). But, more importantly, in the instances complained of by defendant, the requirements of Guillory were not met. Therefore, even assuming Guillory is still good law, it would not be authority for admitting these medical bills into evidence.
Defendant first objects to Austin # 14, consisting of bills from Dr. Thomas L. Brown for various diagnostic procedures including a CT scans of plaintiff's cervical spine, two CT scans of her lumbar spine, one CT scan of her upper extremity, a discogram, an arthrogram of her shoulder, a whole body scan, a tomography of the cervical spine at the C4-C5 level, and two entries for "cineurography." The total amount of these bills was $3,050.00. Dr. Brown did not testify at trial, nor did anyone from his office testify as to the bills. Therefore, under the Code of Evidence they were improperly admitted.
Defendant next objects to Austin # 16, a bill for an MRI test performed on August 12, 1988. Plaintiff submits that defendant is barred from raising this objection on appeal because he effectively failed to object at trial. A failure to object at the time of introduction at trial precludes a party from raising the objection on appeal. Coiled Tubing, Inc. v. Morris, 420 So.2d 1267 (La.App. 3rd Cir.1982). Although counsel for defendant initially objected to the introduction of Austin # 16, he subsequently stated that he would withdraw his *209 objection if Dr. Flynn's deposition reflected that he ordered it performed. In his video deposition taken on September 1988, Dr. Flynn stated that plaintiff had an MRI performed in August 1988, and he proceeded to testify as to the results of that MRI. Therefore, we agree with plaintiff that this objection was withdrawn as if it had never been entered and, thus, the objection cannot be raised on appeal.
Defendant next objects to Austin # 19, consisting of charges for physical therapy at Gulf Breeze Physical Therapy and Rehabilitation services, allegedly incurred by plaintiff. In her video deposition, Dianne DeJean, plaintiff's treating physical therapist and administrator at Gulf Breeze, testified that she treated plaintiff beginning on December 2, 1986, and was treating plaintiff at the time she gave her deposition on April 28, 1987. Ms. DeJean said plaintiff related her problems to the May 1983 accident. Plaintiff was referred to DeJean by Dr. Flynn. At the end of her deposition DeJean stated that her total bill for treating plaintiff was $2,495.00, thus establishing by direct testimony, independently of any documentary hearsay evidence, that amount as an element of special damages.
The medical bills submitted by plaintiff at trial amount to, by our calculation, $2,989.00, which includes, by our calculation, $494.00 for treatment after Ms. DeJean's April 28, 1987 deposition. It is this amount, $494.00, which defendant claims was not supported by competent evidence, since Ms. DeJean did not testify as to these post-April 28, 1987 treatments. Defendant maintains the bills are inadmissible hearsay. Plaintiff argues that the bills are admissible because Ms. Dejean testified in her deposition that she was still treating plaintiff once a week as of April 28, 1987. We disagree with plaintiff's argument. The medical bills from Ms. DeJean are inadmissible, at least insofar as they pertain to billings for treatments after April 28, 1987. The trial court erred in admitting them to prove $494.00 in past medical expenses.
Defendant next objects to the introduction of Austin # 20, copies of prescription bills in the amount of $5,664.93, including $3,330.00 for a whirlpool for home use prescribed by Dr. Flynn. Defendant objected to this exhibit because plaintiff was simply shown the stack of prescription receipts, and identified them as ones she gave her attorney. Plaintiff did not go through each prescription and identify it. Plaintiff argues on appeal that the prescription receipts are admissible because the physicians who prescribed the medications are listed on the receipts and they testified at trial as to the medications they prescribed for plaintiff.
The prescriptions are clearly hearsay and absent an exception provided by the Code of Evidence or other legislation, they are inadmissible as evidence. La.C.E. art. 802. Plaintiff cites no exception or legislation under which the prescriptions can be admitted in evidence, nor can we find one. Therefore, we find the trial court erred in admitting the copies of the prescriptions in evidence to prove $5,664.93 in past medical expenses. We will amend the trial court judgment accordingly.
Defendant next objects to Austin #21, a bill for $100.00 from Dr. Daniel Trahant, a neurologist, with a notation at the bottom, "Diagnosis: Muscle contraction headaches," and dated October 25, 1985. Plaintiff states that was a bill for a neurological exam recommended by Dr. Philips to rule out neurological problems before he operated to remove the disc and fuse her cervical spine. Dr. Philips did not recall the name of the neurologist. This item of evidence was not admissible under the Code of Evidence to prove $100.00 in past medical expenses.
Defendant also objects to the introduction of Austin # 22, a bill from Dr. Gustavo A. Gutnisky for $220.00. Plaintiff confirmed that when she was in Slidell Memorial Hospital Dr. Gutnisky examined her neck. Records from the Slidell hospital, which apparently were admitted without objection by defendant, list Dr. Gutnisky as a consulting physician for plaintiff. A consult report by Dr. Gutnisky is also contained in these records. $80.00 of Dr. *210 Gutnisky's bill is for a consult and exam. We find that the Slidell Hospital bill together with the bill from Dr. Gutnisky established $80.00 in past medical expenses.
We will amend the judgment of the trial court to reduce the award of $25,000.00 for past medical expenses by $9,448.93.

DAMAGES
Defendant claims the jury abused its discretion in awarding plaintiff damages for mental and physical pain and suffering, physical disability, lost wages and lost earning capacity.
1. Mental and Physical Pain and Suffering and Disability:
The jury assessed damages for past, present and future physical and mental pain and suffering at $175,000.00, and physical disability at $75,000.00, a total of $250,000.00 in general damages. Defendant submits these damages are excessive and an abuse of discretion.
Before an appellate court can disturb a trial court's award of general damages, the record must clearly reveal that the trier of fact abused its discretion in making the award. Only after finding that the record shows that the trial court abused its discretion can the appellate court disturb the award, and then only to the extent of raising or lowering it to the highest or lowest point which would have been within the discretion afforded the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Reck v. Stevens, 373 So.2d 498 (La.1979). Before an appellate court questions a trial court award as inadequate or excessive, it must look not to prior awards, but to the individual circumstances of the instant case. Reck v. Stevens, 373 So.2d at 501.
The previously discussed medical evidence is supportive of the award of general damages. Plaintiff underwent removal of a disc and had a fusion performed on her cervical spine. The accident occurred in May 1983 and she said she has been without pain since then for only a two month period. Two of plaintiff's treating physicians testified that they felt she was not a malingerer. Plaintiff, her husband and two children all testified that her injuries have prevented her from doing and enjoying the varied recreational activities that she used to engage in, including waterskiing, camping, bowling and playing baseball. She said her pain has prevented from taking care of her three children like she would have wanted. She can't do the types of housework she used to do before the accident. She also said she wasn't able to engage in normal marital relations with her husband.
Plaintiff testified that she began to get depressed after her fusion failed. The records of Slidell Memorial Hospital reflect that plaintiff was treated for "probable major depression, possibly secondary to her chronic pain problem." Plaintiff works hard at controlling her pain, she undergoes physical therapy, wears a cervical collar, uses a TENS unit to reduce pain by electrical stimulation, and takes various medications.
Dr. Philips assessed a 20% functional impairment of plaintiff's cervical spine as a result of her injury, disc removal and fusion. Dr. Flynn's testimony indicates that the original injury to the C4-C5 disc has affected cervical discs at other levels to the extent of requiring possible surgery.
Considering the impact her injuries have had on plaintiff, we are unable to say the record reflects that the jury clearly abused its discretion in awarding her $175,000.00 for past and present physical and mental pain and suffering, and $75,000.00 for physical disability.
2. Future Medical Expenses:
Defendant submits that the jury erred in determining that plaintiff was entitled to $75,000.00 for future medical expenses. Future medical expenses must be established with some degree of certainty. Burton v. Berthelot, 567 So.2d 649 (La. App. 4th Cir.1990), writ denied, 569 So.2d 989 (La.1990). However, an award of future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. *211 Burton v. Berthelot, supra; Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir.1974), overruled on other grounds, Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4th Cir.1990), writ denied, 568 So.2d 1062 (La.1990).
While there was evidence presented at trial that plaintiff may need surgery in the future, there was no specific evidence presented as to the cost of any such future surgery. However, the evidence supports the conclusion that plaintiff will need medication, physical therapy, and medical care in the future because of her injuries. The jury determined that plaintiff was entitled to $25,000.00 in past medical expenses. The jury could have looked at that figure of $25,000.00 representing medical expenses for the past seven years and reasonably determined that this amount would represent her future medical expenses. However, we determined that bills representing $9,448.93 were improperly admitted. Therefore, we believe the jury could have awarded only $15,551.07 in future medicals, based on the evidence before it.
We find that an award of more than $15,551.07 for future medical expenses is not supported by the record and is too speculative. Therefore, we will amend the judgment of the trial court to reduce the award for future medical expenses to $15,551.07.
3. Lost Wages:
The jury assessed damages for plaintiff's lost wages in the amount of $63,000.00. Defendant claims plaintiff produced no evidence to support a claim for lost wages.
A claim for lost wages need not be proven with mathematical certainty. The proof needed to reasonably establish the claim may consist of the plaintiff's own testimony. Sherlock v. Berry, 487 So.2d 555 (La. 4th Cir.1986), writ not considered, 489 So.2d 912 (La.1986); Rheams v. McCray, 346 So.2d 834 (La.App. 1st Cir. 1977), writ denied, 351 So.2d 154 (La.1977).
Plaintiff testified that she was working as a cosmetologist at the time of the accident. Following the accident she began having problems working, doing such things as holding her arms up while cutting and blow-drying hair. She subsequently had to quit working at that occupation. After leaving full-time cosmetology work, plaintiff went to work as a bartender at a Holiday Inn in Slidell. She was able to handle that work for approximately ten months. While working at Holiday she began doing cosmetology work on a part-time basis out of her residence, thinking that she could handle doing that type of work at her leisure. She did operate the business out of her home on a casual basis but eventually stopped doing that because of pain. She also worked as a bartender for another hotel around this time. She did not testify how long that job lasted.
Plaintiff moved to Florida in the Fall of 1986. She worked for "a little over a year" in Florida as a chiropractor's assistant. She quit working for the chiropractor and began working again as a beautician or cosmetologist for a short time until she began experiencing problems. She quit that job after Dr. Flynn advised against doing that type of work. As of the time of trial plaintiff testified she was working twenty hours a week in the cosmetics section of a department store. She said twenty hours a week was all she felt that she could work.
Nowhere in plaintiff's testimony does she mention how much she was earning at any of her jobs, either before or after the accident. Therefore, we will assume, as we believe the jury could have done, that she was earning the federal minimum wage, which during this period was $3.35 per hour. The trial took place some seven years after the accident. The record reflects that plaintiff was definitely working for two of those years, one as a bartender and one as a chiropractor's assistant. That leaves five years. At the time of trial she was working half-time (20 hours per week) but the record does not show how long she had been working there. One can infer from the record that she had not been working there more than one year. That leaves four years that *212 plaintiff was unable to work as a result of the accident. Plaintiff agrees with this four year figure in her brief on appeal. At the rate of $3.35 per hour, for a forty hour work week, for fifty weeks a year, this amounts to $26,800.00 in lost wages over four years. The record does not support an award of more than $26,800.00 for lost wages. The judgment will be amended accordingly.
4. Lost Earning Capacity:
The jury assessed damages for lost earning capacity at $100,000.00. Defendant argues there is no evidence as to plaintiff's lost earning capacity.
Before a person can recover damages for future lost wages/lost earning capacity, they must prove the loss with reasonable certainty. Whatley v. Regional Transit Authority, 563 So.2d 1194 (La. App. 4th Cir.1990), writ denied, 569 So.2d 965 (La.1990). See also, McGowan v. Sewerage and Water Board of New Orleans, 555 So.2d 472 (La.App. 4th Cir.1989). However, such damages need not be proven with mathematical certainty. Whatley v. Regional Transit Authority, supra. A trial court is afforded broad discretion in the determination of such damages. Perez v. State, Department of Transportation and Development, 578 So.2d 1199 (La.App. 4th Cir.1991), writ denied, 581 So.2d 706 (La.1991).
The video deposition of H. Britt Landrum, a vocational rehabilitation specialist, was played for the jury. He stated that for eighteen years prior to 1982 plaintiff did not work but stayed home to raise her family. His findings on evaluation were, for the most part, positive. He found that plaintiff had average intelligence, excellent manual dexterity, presented an attractive appearance, a high school education with some college work, above-average reading and writing and abilities, and a fair ability to work with figures. She had physical limitations on the types of work she could perform, however. Plaintiff was 37 years old at the time of trial.
Landrum testified on cross-examination that the net result of his evaluation was that plaintiff is able to find employment that would earn her approximately the same amount of money she was earning before the accident.
Considering Landrum's testimony, we find that the record does not support an award of $100,000.00 for loss of earning capacity. However, we do believe that plaintiff suffered some loss of earning capacity because of her physical limitations. The jury could have awarded no more than $30,000.00 for this element of damages. We will amend the judgment of the trial court accordingly.

MOTION FOR NEW TRIAL OR REMITTITUR
Following the jury verdict and entering of judgment, defendant filed motion for new trial or, in the alternative, a motion for remittitur. The trial court denied the motions. On appeal, defendant claims the trial court erred in denying the motions because plaintiff and several of her witnesses perjured themselves at trial.
The perjury charge is a reference to an admission by plaintiff at trial that she lied when she stated during a 1987 deposition that her brother was not tried or never went to court in connection with the altercation between them. She said she was embarrassed about the incident and didn't feel it was necessary to bring it up. Plaintiff's husband also stated during a 1987 deposition that he didn't know whether there had been a trial involving the incident. At trial in the instant case he admitted that he had been untruthful. He said he and his wife discussed it beforehand and they decided it would be airing the family's dirty laundry, and decided not to mention it.
Plaintiff also failed to mention the altercation with her brother to her treating physicians. Both said if she had been injured during the altercation it might have affected their opinion as to the cause of her problems vis-a-vis the May 1983 accident. But that would have depended on the severity of the injury sustained, and the jury could have believed plaintiff's testimony *213 that she was not significantly injured. All of this was brought out before the jury and we must presume the jury considered this evidence in reaching their decision.
A new trial shall be granted by the trial court when the verdict or judgment is clearly contrary to the law and the evidence. La.C.C.P. art. 1972(1). A new trial may be granted in any case where there is good ground therefor. La.C.C.P. art. 1973.
The issue of the whether the trial court erred in denying the motion for new trial under C.C.P. art. 1972(1) is mooted by our review of the merits of defendant's appeal. See Sumrall v. Trosclair, 270 So.2d 921 (La.App. 4th Cir.1972). As to the denial of the motion under the discretionary C.C.P. art. 1973, we have reviewed the evidence and are unable to say the trial curt abused its discretion in denying the motion for new trial. See Walters v. Canal Motors, Inc., 240 So.2d 101 (La.App. 4th Cir.1970).
As to the trial court's denial of defendant's motion for remittitur, we believe that issue is mooted by our review of the merits of defendant's appeal and our reduction of the damage award.
For the foregoing reasons, we amend the judgment of the trial court to award general and special damages to plaintiff, Donna B. Austin, as follows:

Mental & Physical Pain &
 Suffering $175,000.00
Physical Disability $ 75,000.00
Lost Wages $ 26,800.00
Lost Earning Capacity $ 30,000.00
Past Medical Expenses $ 15,551.07
Future Medical Expenses $ 15,551.07
 ___________
Total $337,902.14

We affirm the judgment as amended and in all other respects.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] Plaintiff's initial petition named Popeye's Fried Chicken of Louisiana, Inc. as a defendant. By a third supplemental and amending petition plaintiff added as a defendant, A. Copeland Enterprises, Inc., d/b/a Popeye's Famous Fried Chicken. Subsequently, by an ex parte motion, plaintiff subsequently had Al Copeland Enterprises, Inc. substituted for A. Copeland Enterprises, Inc.
[2] This case has been before us on two prior occasions. In Austin v. Pascarelli, 522 So.2d 1206 (La.App. 4th Cir.1988), this court reversed a partial summary judgment granted in favor of plaintiff on the issue of Pascarelli's status vis-a-vis his employment with Copeland. In Austin v. Pascarelli, 531 So.2d 550 (La.App. 4th Cir.1988), this court reversed a summary judgment dismissing Copeland's cross-claim against Pascarelli.
[3] At one time plaintiff worked as a chiropractor's assistant and had, herself, trained to be a chiropractor but never passed the licensing examination.